**Stephen KOZUP, et al., Plaintiffs,**

v.

**GEORGETOWN UNIVERSITY, et al., Defendants.**

**Civ. A. No. 86–0033.**

United States District Court, District of Columbia.

July 7, 1987.

John G. Gill, Jr., Rockville, Md., for plaintiffs.

Peter M. Bleakley, Peter M. Chadwick, Donald T. Hornstein, Arnold & Porter, Washington, D.C., for Red Cross.

J. Alan Galbraith, Jeanne M. Rowzee, Esquire (Williams & Connolly) Washington, D.C., of counsel: Julie Gross Adelson, Sheila Zimmet, Office of Legal Affairs, Georgetown University Hosp., Washington, D.C., for Georgetown.

## MEMORANDUM

FLANNERY, District Judge.

This matter comes before the court on motions of defendants Georgetown University ("Georgetown") and The American Red Cross ("ARC") for Summary Judgment as to all remaining counts of plaintiffs' Amended Complaint. For the reasons set forth below, summary judgment on all counts is proper.

### I. *Facts*

This action arose from the circumstances surrounding the birth of Matthew Kozup, the son of plaintiffs Stephen and Susan Kozup, and the brother of plaintiff Sarah Kozup. On December 26, 1982, Susan Kozup was admitted to the High Risk Obstetrical Unit of Georgetown University Hospital, when it appeared that delivery of her child would involve complications. On January 9, 1983, Mrs. Kozup went into labor. Matthew was born at 9:15 a.m. on January 10, 1983, and shortly thereafter, Georgetown began giving Matthew blood transfusions for hypovolemia, a condition associated with premature birth. Over the course of two days, January 12 and 13, Matthew received three transfusions which were contaminated with the virus now known to transmit Acquired Immune Deficiency Syndrome (AIDS). Plaintiffs' Amended Complaint, ¶¶ 5–11.

Defendant ARC supplied the contaminated blood to Georgetown. According to ARC records, the blood had been donated in October, 1982, by an individual who subsequently developed AIDS, and died from opportunistic infections associated with the disease. At the time of his donation, however, the donor was in good health.

Plaintiffs allege that as a result of the transfusions Matthew received in the days immediately following his birth, he was permanently infected with AIDS. Because of this infection, plaintiffs allege, Matthew continually contracted numerous opportunistic infections over the three years of his life, causing neurological impairment and stunting his mental and physical development. Plaintiffs' Amended Complaint ¶¶ 24–25. On July 10, 1986, Matthew died, allegedly from complications related to infection with the AIDS virus.

Plaintiffs filed the present action seeking relief both under the District of Columbia Survival Statute as co-administrators of Matthew's estate, and in their own right under a theory of negligent infliction of emotional distress. Plaintiffs' Amended Complaint seeks $15,000,000 under each of

nine separate counts, alleging negligence, breach of implied warranty, strict liability, lack of informed consent, and violation of the District of Columbia Consumer Protection Act on the part of both defendants, and battery on the part of Georgetown alone. Each of these counts will be addressed in turn.

## II. *AIDS: A Medical Chronology*

In order to resolve the pending motions for summary judgment, it is critical to understand exactly what was known about AIDS by the scientific and medical communities, and when. Much of plaintiffs' claim turns on allegations that defendants knew or should have known certain facts related to AIDS, and a chronology of research and information about AIDS is therefore a necessary foundation for any resolution by the court.

AIDS has been described as an impairment of the body's natural immune system of defense against disease that renders a person vulnerable to infections and various illnesses. Persons with AIDS are susceptible to contracting a number of diseases and opportunistic infections that would not be harmful to a person whose immune system was functioning properly. Hermann, *AIDS: Malpractice and Transmission Liability*, 58 U.Colo.L.Rev. 63–64 (Winter 1986–7). In June and July of 1981, the first few cases of what has since been termed Acquired Immune Deficiency Syndrome were diagnosed. Exhibits D–1, D–2 to ARC's Motion for Summary Judgment (30 Morbidity and Mortality Weekly Report 250–252, 305–308 (June 5, July 4, 1981) [hereinafter "MMWR"]). In these first few cases, patients developed an unusual form of skin cancer, Kaposi's sarcoma, or a type of pneumonia caused by the protozoan *pneumocystis carinii. Id.* As more cases began to be diagnosed, it appeared that AIDS was especially prevalent among certain groups, namely homosexual males, intravenous drug users, and recently immigrated Haitians.

In July, 1982, three cases of *pneumocystis carinii* pneumonia were diagnosed in hemophiliacs. · Exhibit D–3 to ARC's Motion for Summary Judgment (31 MMWR 365–367 (July 16, 1982)). These cases, in patients who regularly received a clotting factor composed of blood products, raised the possibility that AIDS might be bloodborne. Accordingly, on July 27, 1982, an Open Meeting of the Public Health Service Committee on Opportunistic Infections in Patients with Hemophilia was held, which representatives of the ARC, the Center for Disease Control, the National Institutes of Health, the Food and Drug Administration, the American Association of Blood Bankers, the National Gay Task Force, and other blood banking and public health organizations attended. The Report of that meeting stated that AIDS had "characteristics which suggest an infectious etiology," and that a "possible mode of transmission is via blood products." Exhibit E–1 to ARC's Motion for Summary Judgment. No recommendations or conclusions were made at that meeting. *Id.*

In December, 1982, the Center for Disease Control reported a case of "Possible Transfusion-Associated AIDS—California." Exhibit D–5 to ARC's Motion for Summary Judgment (31 MMWR 652–654 (Dec. 10, 1982)). In that case, an infant received blood platelets under circumstances similar to those surrounding Matthew Kozup's birth, and subsequently was diagnosed as suffering from AIDS. The infant did not fit into any of the previously noted high risk categories for AIDS, and thus the transfusions he received became the focus of the medical community's attention.

In January, 1983 a Workgroup to Identify Opportunities for the Prevention of AIDS was convened, consisting of representatives of many of the same organizations that had attended the July, 1982 meeting on hemophilia and AIDS. The Summary Report of that meeting indicates that as of the date of the meeting, January 4, 1983, there were five reported cases of AIDS among hemophiliacs, one possible transfusion-related case, and five other cases related to blood products. Exhibit E–3 to ARC's Motion for Summary Judgment. At the meeting, a consensus was reached for the proposition that members of high risk groups for AIDS should some-

how be excluded from donating blood. However, the Report indicates that "no consensus was reached as to the best method for doing this." *Id.*

The Workgroup addressed the possibility of screening out male homosexuals, but concluded that such a procedure would be "intrusive," "unethical," and might "institutionalize a stigma on groups already prone to prejudice and persecution." *Id.* Further, the Workgroup questioned whether such a procedure might prove effective, given the possibility that many potential donors would be reluctant to disclose that they were homosexual, or might themselves conclude that they were not at risk for contracting or carrying the disease. *Id.* For these reasons, no recommendations were made at the meeting as to how to screen out high risk donors. The Public Health Service Committee promised to issue recommendations as soon as possible thereafter.

On January 13, 1983, the ARC, the American Association of Blood Bankers, and the Council of Community Blood Banks issued a "Joint Statement on AIDS Related to Transfusion." Exhibit F-1 to ARC's Motion for Summary Judgment. The Joint Statement concluded that "evidence [was] inconclusive" as to the hypothesis that AIDS was transmissible by blood. *Id.* The hypothesis was referred to as a "possibility, still unproven." *Id.* The Joint Statement recommended that hospitals consider making autologous transfusions more readily available, especially for those undergoing elective surgery. It further recommended more thorough screening for symptoms of AIDS in potential donors. However, the Joint Statement did not recommend any laboratory screening tests, nor did it recommend that donors be screened on the basis of their sexual preference. *Id.* Finally, the Joint Statement noted the statistic that, while some 10,000,000 transfusions had been performed in 1982, only 10 of the approximately 800 AIDS cases that had been diagnosed as of that date were possibly blood-related.

On March 4, 1983, the Public Health Service Committee issued its promised recommendations for donor screening, which paralleled those issued weeks later by the Bureau of Biologics ("BoB") of the Food and Drug Administration. Both recommended that, prior to donating blood, donors be given pamphlets describing high risk groups, so that they could self-screen based on the information in the pamphlets. Exhibit E-4 to ARC's Motion for Summary Judgment; Eckert, *AIDS and the Blood Bankers*, Regulation, Sept.—Oct. 1986 at 18–19. The BoB recommended improved educational programs for blood bank personnel, so that they could better assist donors in recognizing the symptoms of AIDS. Exhibit E-5 to ARC's Motion for Summary Judgment. Neither recommended use of surrogate tests. These guidelines were promptly implemented by the ARC. ARC Memorandum at 15.

It was not until 1984 that the medical community reached a consensus as to the proposition that AIDS was transmissible by blood. Curran, Lawrence, *et al.*, *Acquired Immune Deficiency Syndrome (AIDS) Associated with Transfusions*, 310 New Eng. J.Med. 69, 70 (1984); *AIDS Transmission via Transfusion Therapy*, 8368 The Lancet 102 (Jan. 14, 1984), *cited in Hospital and Blood Bank Liability to Patients Who Contract AIDS Through Blood Tarnsfusions*, 23 San Diego L.Rev. 875, 878 & n. 10.

In April, 1984, scientists identified the virus HTLV–III as the cause of AIDS. Fischinger, *Acquired Immune Deficiency Syndrome: The Causative Agent and the Evolving Perspective*, 9 Current Problems in Cancer 4 (1985); *Perspectives on the Future of AIDS*, 253 J.Am.Med.A. 247 (1985), *cited in* 23 San Diego L.Rev. 875, 879 & n. 19, 20. By May, 1985, an enzyme-linked immunosorbent assay (ELISA) test was made available, which screens for the antibodies sensitive to HTLV–III. Hermann, *AIDS: Malpractice and Transmission Liability*, 58 U.Colo.L.Rev. at 77. Once it was available, the Center for Disease Control issued guidelines for implementing the ELISA test. *Id., citing Professional Public Health Service Interagency Recommendations for Screening Donated Blood and Plasma for Antibody*

*to the Virus Causing AIDS*, 34 MMWR 1 (1985). This laboratory test has proven 98.6% effective in detecting exposure to AIDS. Comment, *Transfusion-Associated Acquired Immunodeficiency Syndrome (AIDS): Blood Bank Liability?*, 16 U.Balt.L.Rev. 81, 86 & n. 36. When coupled with a second test, the Western Blot Analysis, the rate of detection for exposure to AIDS rises to 100%. *Id.* at n. 37. There is still no test for presence of the virus itself, nor is there a cure for the disease.

With this chronology in mind, the court can now turn to the various theories of liability presented by plaintiffs.

### III. *Informed Consent and Battery*

Plaintiffs allege that on January 12, 1983, defendants Georgetown and the ARC knew or should have known that contracting AIDS from blood was a material risk of transfusion, and that failure to inform Matthew's parents of this risk constituted negligence. Plaintiffs' Amended Complaint, Count II. Lack of informed consent as a basis for negligence lies primarily against defendant Georgetown, as the party in direct communication with plaintiffs, although plaintiffs have alleged this as a theory of liability against both defendants.

In order for defendants to prevail on this issue on a motion for summary judgment, they must show that there is no genuine issue of material fact as to the elements of an action for lack of informed consent. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (summary judgment standard must be read in conjunction with substantive law of cause of action alleged). Those elements are set forth in the leading case of *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir. 1972).

In *Canterbury*, plaintiff was a patient who underwent surgery for back pain, without being told by his physician that surgery entailed a 1% risk of paralysis. The United States Court of Appeals for the District of Columbia Circuit held that a directed verdict for defendant was not proper on the evidence. The court set forth fully the elements of and rationale for liability under a theory of lack of informed consent, and held that in order to

prevail on this theory, a plaintiff must show that there was a material risk associated with his or her treatment which plaintiff's physician failed to disclose and which, if disclosed, would have caused plaintiff to decline that course of treatment which resulted in plaintiff's injury. 464 F.2d at 790. Two of these elements present problems for plaintiffs in this action.

First, the *Canterbury* court held that the risk involved in a patient's treatment must be *material*. The court declined to define materiality in wholly subjective terms, instead holding that a risk is material:

> when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.

464 F.2d at 787. The court noted that it is "obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment— no matter how remote—and generally unnecessary from the patient's viewpoint as well." *Id.* at 786. Finally, and perhaps most important for this case, the *Canterbury* court noted that "the physician's liability for nondisclosure is to be determined by foresight, not hindsight." *Id.* at 787.

■ No reasonable jury could find that the possibility of contracting AIDS from a blood transfusion was a material risk at the time Matthew Kozup received his three transfusions. As of January, 1983, only a single case of possible transfusion-related AIDS had been diagnosed, and that only weeks before Matthew received the contaminated blood. 31 MMWR 652–654 (Dec. 10, 1982). This single case stands in contrast to the approximately 3.5 million blood donations annually. A risk of one in 3.5 million cannot be said to be material to a reasonable patient in Matthew Kozup's situation. *Canterbury*, 464 F.2d at 788, n. 86 (reviewing statistical probabilities for which physicians were held liable to inform their patients: liability found for 1% and 3% risk; no liability found for 1 in 800,000 risk or 1 in 250–500 risk). Indeed, plaintiffs' own expert, Dr. Donald Armstrong,

Chief of Infectious Diseases at Memorial Sloan Kettering Cancer Center, admitted that he did not warn his patients prior transfusion in late 1982 or early 1983. Armstrong Depostion at 46–50. Without some evidence to oppose defendants' strong showing of lack of materiality of the risk, plaintiffs cannot prevail.

In addition, as of January, 1983, there was still no consensus in the medical or blood banking communities that AIDS was transmitted by a blood-borne agent. *See supra* at 1052–1053. The viral agent HTLV–III would not be identified for another 15 months. Thus, what doctors "knew or should have known" about the risk of AIDS in blood transfusion therapy was virtually nothing: this remote possibility cannot, as a matter of law, have amounted to a "material risk" within the meaning of that term as set forth in *Canterbury*. Thus, plaintiffs' cause of action under the theory of lack of informed consent must fail on this basis alone.

■ However, in addition to this flaw in plaintiffs' theory, a second equally fatal problem remains. Even if plaintiffs could show that the risk of AIDS would have been material to their decision regarding Matthew's transfusions, plaintiffs must also show that the hospital's failure to warn of that risk *caused* the injury involved. That is, plaintiffs must show that "disclosure of significant risks incidental to treatment would have resulted in a decision against it." *Canterbury*, 464 F.2d at 790. No reasonable jury could conclude on the facts of this case that, had the Kozups been informed of a one in 3.5 million possibility of contracting AIDS, they would have declined to permit Georgetown's physicians to transfuse blood into their son. Matthew was premature and his birth was accompanied by many complications including hypovolemia. The transfusions were absolutely necessary to save his life. Affidavit of K.N. Sivasubramanian, M.D., ¶¶ 4–7 (Matthew's attending physician). Confronted with a decision whether to permit this treatment or to decline it because of the risk of contracting AIDS, no reasonable

person in the Kozup's position would have declined.

In this context, the Court of Appeals's caution that foresight and not hindsight must be the guide becomes critical. With the benefit of the many discoveries related to AIDS in the last several years, including identification of the virus and development of a test to detect exposure to it, one would be tempted to find that knowledge of a risk of AIDS would indeed affect a patient's decision. Yet the focal period for this court's analysis must be January, 1983, when the Kozups would have made their decision about Matthew's treatment. In January, 1983, with only a single possibly transfusion-related case having been diagnosed, and with Matthew's life at risk without immediate blood transfusions, there can be no doubt what "a reasonable person in the patient's position would have decided if suitably informed of all perils bearing significance." *Canterbury*, 464 F.2d at 791. As tragic as the ultimate results were, they cannot be permitted to affect an objective consideration of what the Kozups' decision-making process would have been in January 1983, if the risk of AIDS had been disclosed to them. Thus, as to the element of causation, plaintiffs' action for lack of informed consent must also fail.

■ Defendant ARC's liability is slightly different from that of Georgetown on this theory, since ARC did not communicate directly with the Kozups, but only with defendant Georgetown. ARC argues that it is not liable for lack of informed consent, since the information that it provided to Georgetown was at all relevant times adequate, and since ARC is not liable for any failure on the part of plaintiffs' physicians to adequately warn plaintiffs about material risks under the 'learned intermediary' doctrine. The court need not reach these arguments, since the fact, discussed above, that plaintiffs' physicians were not obligated to disclose the risk of AIDS to plaintiffs compels the conclusion that no liability can be imposed on ARC. Because plaintiffs had no right to be informed of the risk of AIDS prior to the transfusions at issue, it is irrelevant what information the ARC fur-

nished to Georgetown regarding AIDS and blood. It would make no sense to hold ARC liable on an informed consent theory for failure to disclose information which as a matter of law was not material to the Kozup's decision. Accordingly, summary judgment for the ARC as to Count II of Plaintiffs' Amended Complaint is proper.

■ Finally, plaintiffs allege that failure to inform them of the risk of AIDS constituted a battery by Georgetown against Matthew Kozup. Plaintiffs' Amended Complaint, Count I. Because a prima facie case of lack of informed consent is the necessary underpinning for an action for battery, this theory must be rejected for the reasons set forth above. Defendants are entitled to summary judgment on both the lack of informed consent allegations and the allegation of battery.

## IV. *Negligence*

Plaintiffs separately allege negligence in addition to lack of informed consent as a basis for recovery from both defendants. Plaintiffs' theories of negligence are different as against each defendant, but on neither theory are they able to withstand summary judgment.

### A. *Georgetown's Negligence:*

Plaintiffs allege that Georgetown was negligent in failing "to take any measures designed to protect Matthew from being infected with AIDS." Plaintiffs' Amended Complaint, ¶ 47 (Count III). Specifically, plaintiffs contend that Georgetown should have offered them the option of directed donation. That is, plaintiffs assert that they were ready, willing, and able to donate blood compatible with Matthew's needs, and that they would have chosen to do so had they known the risk of AIDS. The issue of informed consent, or knowledge of this risk, has already been fully discussed above, so plaintiffs' case of negligence against Georgetown consists of the allegation that Georgetown breached its duty of care in failing to offer a directed donation option to the Kozups prior to transfusing Matthew.

This theory fails for the simple reason that *no* hospital in the District of Columbia offered such an alternative to patients in Matthew's situation. As of January, 1983, no hospital in the United States took special AIDS-related measures in connection with transfusions. Georgetown Memorandum at 19; Georgetown Reply Memorandum at 4. Plaintiffs do not attempt to counter this fact in their opposition, and accordingly, it must be taken as conceded.

■ It is clear that in order to prevail on a theory of negligence, plaintiffs must show that defendant Georgetown violated a standard of care. For a hospital, that standard is established by looking to the conduct of the medical profession in similar circumstances as of that date. *Morrison v. MacNamara,* 407 A.2d 555, 561 (D.C.App. 1979). Plaintiffs do not dispute that this is the governing standard. Yet, plaintiffs cannot point to a single hospital that was taking the measures which plaintiffs contend it was negligent for Georgetown not to take. All they offer is the testimony of two physicians who contend in hindsight that all hospitals should have been doing more to screen blood and donors than they were doing in late 1982 and early 1983. These opinions cannot be permitted to supplant the standard of care as established by the conduct of the medical community which plaintiffs' experts criticize. Because plaintiffs fail to make out a prima facie case of negligence, summary judgment for Georgetown on the issue of negligence (Count III of Plaintiffs' Amended Complaint) is proper.

### B. *The American Red Cross's Negligence:*

Plaintiffs allege that the ARC was negligent, as measured by the ARC's own standards. Plaintiffs contend that the ARC breached its goal of providing an adequate blood supply from the safest possible donors, Plaintiffs' Memorandum in Opposition to ARC's Motion for Summary Judgment at 41–46, *citing, inter alia,* Annual Report of the American Red Cross at 7 (Oct. 1982), in its failure: (1) to screen donors that were members of high risk

groups for AIDS; (2) to implement tests that would have eliminated blood contaminated with AIDS; and (3) to warn plaintiffs of the dangerous condition of the blood Matthew received. Plaintiffs' Amended Complaint, ¶¶ 53–55 (Count IV). This last allegation has been addressed above. What remain are plaintiffs' allegations that the ARC knew or should have known that AIDS was transmissible through blood, and should have screened donors and implemented laboratory tests to eliminate contaminated blood.

In addition, plaintiffs attempt, through strained and circular argument, to show that the ARC's failure to take these measures as of October, 1982 amounted to a violation of various federal regulations. Plaintiffs' Memorandum in Opposition to ARC's Motion for Summary Judgment at 52–54. These arguments have little merit since their application assumes that the ARC's failure to adopt these measures was negligent, the very question before the court. For reasons similar to those discussed in the context of Georgetown's alleged negligence, plaintiffs' negligence theory must fail.

■ The cornerstone of plaintiffs' theory is that as of October, 1982, when the ARC collected the blood which Matthew received, the ARC knew or should have known that AIDS was transmissible by blood and was therefore a risk associated with blood collection and transfusion. A review of the medical chronology set forth above reveals that this is inaccurate. While three cases of AIDS in hemophiliacs had been reported in July of 1982, 31 MMWR 365–367 (July 16, 1982), these cases lent support only to an hypothesis about the cause or transmission of AIDS. They were far from sufficient to permit any conclusions. Other hypotheses were supported by other facts then known, including facts related to drug use, recurrent exposure to foreign proteins, toxins, or sperm, and recurrent infection with relatively common viruses, theories about 'immune overload.' ARC Memorandum at 11–12, *citing* J. Marx, *New Disease Baffles Scientific Community*, 217 Science 618–

621 (Aug. 8, 1982). The December, 1982, diagnosis of a possibly transfusion-related case of AIDS came two months *after* the contaminated blood which Matthew was to receive had already been collected by the ARC. 31 MMWR 652–654 (Dec. 10, 1982). It would be wholly unreasonable to argue that these facts compelled the conclusion that AIDS was communicated by a blood-borne agent, and that failure to reach such a conclusion in October, 1982, constituted negligence.

Plaintiffs nevertheless argue that the ARC should have screened out donors who were members of high risk groups, and that its failure to do so was the proximate cause of Matthew's death. Presumably, plaintiffs' argument is that the ARC should have screened out male homosexual donors, since this was the only high risk group to which the actual donor of the contaminated blood belonged. ARC Memorandum at 22, *citing* Answer to Plaintiffs' Request for Admissions No. 12. In order for this screening to have prevented Matthew's infection with AIDS, the ARC would have had to have implemented it by October, 1982. The record is clear that as of that date, no organization in the country recommended such a course of conduct, including blood banks, hospitals, and federal health care regulators.

Indeed, when the subject of screening homosexuals out of the donor population arose in the January 4, 1983, meeting of blood banking professionals and government agencies concerned with the spread of AIDS, the suggestion was rejected for a variety of reasons. These included concerns about the invasion of personal privacy that such screening would entail, the potentially negative effects of such screening, as well as strong doubts about effectiveness of such a program. Exhibit E–3 to ARC's Motion for Summary Judgment, *supra* ("Summary Report"). The medical community was not yet convinced that AIDS had an asymptomatic carrier state, a necessary predicate to a conclusion that AIDS might be transmissible by blood. Thus, the facts and dates clearly preclude plaintiffs' success on a theory of negli-

gence as to ARC's failure to screen out high risk donors.

Plaintiffs argue in addition that it was negligent for the ARC to fail to use surrogate laboratory tests to eliminate contaminated blood from the blood supply. Plaintiffs concede that during the relevant period, there was no test for AIDS itself, or even for exposure to AIDS. There is still no test for the former, and the test for the latter was not licensed for use until March, 1985. Plaintiffs argue, however, that AIDS and hepatitis were closely linked in the early years of research into the disease, and that those groups at risk for hepatitis were the same groups at risk for AIDS. Plaintiffs therefore suggest that the ARC should have implemented what is known as the Hepatitis B core antibody test, which plaintiffs contend would have screened out 90% or more of AIDS-contaminated blood while screening for hepatitis–B. Plaintiffs' Amended Complaint, ¶ 53(c); Plaintiffs' Opposition at 58, 94.

Plaintiffs are in error for two reasons. First, plaintiffs can point to no organization, governmental or medical, which advocated the use of this test as a means of screening blood for AIDS. Instead, plaintiffs offer testimony of two experts whose current opinion is that hospitals and blood banks should have used the core antibody test and should have screened gay men out of the donor pool. Deposition of Dr. E. Allen Griggs at 70–71, 167–168; Deposition of Dr. Donald Armstrong at 73, 96. Neither of these experts suggested either course of conduct in late 1982 or early 1983. Indeed, Dr. Armstrong was present at the January 4 meeting of the Public Health Service Committee, and did not then propose either as a strategy for combatting the disease. Neither expert's hospital had these safeguards in place during the relevant period. These two individuals' opinions cannot alone create a standard of care or a prima facie case of negligence, where they are entirely in opposition to the standard prevailing at every hospital and blood bank in the nation. To permit these hindsight opinions to preclude summary judgment would violate the United States Supreme Court's mandate that Rule 56 be construed with due regard to defendants who have shown by competent evidence that a plaintiff's claims have no factual basis. *Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, as with the issue of donor screening, plaintiffs cannot establish a standard of care regarding surrogate tests from which the ARC departed.

▬ To some extent this is admitted by plaintiffs. However, they attempt to argue through their experts that the ARC, as a nationwide leader in the field of blood collection, should not be governed by a community standard of care, but should instead be held to a unique super-standard. While this argument would prove helpful to plaintiffs, who have no factual support for their allegations under traditional negligence principles, it would entirely undercut these traditional principles. It is difficult to conceive of a negligence system which would permit some members of a professional community—those "on the cutting edge," as plaintiffs put it, Deposition of E. Allen Griggs at 62,—to be held to a unique standard above that of other members of the same community. It is unclear how a court would define the qualities that would put an individual or organization above its peers for purposes of determining negligence, or how a court would give content to a standard of care that was defined simply as somewhere above that of the rest of the community. Traditional yardsticks of negligence such as industry practice or the standard of care of a reasonable practitioner in a given field would be of no use. Those members of the 'vanguard' would be measured against a unique standard, which is a contradiction in terms. The practical result of such a scheme would be to impose virtual strict liability on those in the 'vanguard' under the guise of negligence.

This is not, as plaintiffs contend, an instance where "what ought to be done is fixed by a standard of reasonable prudence" but is simply not complied with by an entire community. *See* Plaintiffs' Opposition at 46, *quoting Texas & Pacific Ry. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903) (Holmes, J.). In

that situation, courts have not hesitated to compel an entire community to upgrade its standard of care. *See, e.g., The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.1932) (Learned Hand, J.) (requiring all tugboats to be equipped with radios although none were so equipped at the time). Instead, plaintiffs ask the court to find that what would clearly have been non-negligent conduct for any other member of the blood banking community is nonetheless negligence for the ARC. This result is both unfair and impractical of application. Accordingly, the court declines to accept plaintiffs' novel approach to negligence law.

The second insurmountable hurdle in plaintiffs' negligence case against the ARC is that the Hepatitis B core antibody test, which plaintiffs' experts advocate, would have proved inutile in screening out the donor whose contaminated blood Matthew received. That donor would have tested negative for hepatitis-B at the time of his donation. ARC Memorandum at 22, *citing* Answers to Plaintiffs' Second Set of Interrogatories, No. 4 (Mar. 30, 1987); Affidavit of S.G. Sandler, M.D., ¶ 5 (Apr. 14, 1987). Thus, the critical element of causation, wherein plaintiffs must show that the ARC's failure to implement this test caused Matthew to become infected, is absent. For this second reason, the ARC is entitled to summary judgment as to plaintiffs' negligence count (Count IV of Plaintiffs' Amended Complaint).

### V. *Strict Liability in Tort and Implied Warranties:*

Plaintiffs seek relief under the theory of strict liability in tort for an unreasonably dangerous product, under the Restatement (Second) of Torts § 402A. Plaintiffs' Amended Complaint, Count VI. They also allege a cause of action for breach of the implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code, enacted in the District of Columbia at D.C.Code § 28:2–314, 315 (1981 & Supp.1985). Plaintiffs' Amended Complaint, Count V. Both these theories are rooted in the conception of blood as a product and the ARC's provision of blood to Georgetown as a sale of a product. These conceptions are threshold requirements for application of the strict liability theories which plaintiffs allege in Counts V and VI of their Amended Complaint.

The District of Columbia's Court of Appeals has held that "the current doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy, as the governing principles are identical." *Cottom v. McGuire Funeral Service, Inc.,* 262 A.2d 807, 808 (D.C.App.1970), *cited in Fisher v. Sibley Memorial Hospital,* 403 A.2d 1130, 1133 (D.C.App.1979). Thus, plaintiffs' two separate Counts may be viewed together in determining whether summary judgment for defendants is appropriate. Largely for the reasons stated in *Fisher, supra,* summary judgment for both Georgetown and the ARC is proper.

In *Fisher,* plaintiff sought relief from a hospital for infection with hepatitis as a result of a blood transfusion supplied by the hospital. Plaintiff alleged the same two causes of action alleged by plaintiffs here. The District of Columbia Court of Appeals rejected plaintiff's claims with respect to blood, finding that "characterizing blood plasma as a product governed by strict tort liability is as unnatural as forcing a blood transfusion into the commercial sales mold." 403 A.2d at 1134. Neither theory was justified by public policy, the court found.

The court noted that, rather than being an unreasonably dangerous product, giving rise to strict tort liability, blood should instead be viewed as unavoidably unsafe because the "scientific inability to screen all carriers of viral hepatitis despite due care," *id.* at 1133, combined with the "public interest in assuring the ready availability of blood," *id.,* compelled such a result. Critical to the court's holding was "the difficulty of detecting hepatitis in blood given the current state of medical knowledge." *Id.* In addition, the court noted that under a strict liability regime, "the hospital, no matter how careful, would be held responsible, virtually as an insurer, if the patient were harmed as a result of

impure blood." *Id.* For these reasons, the court concluded that strict liability theories should not be applied to a hospital's provision of blood to its patients.

■ Plaintiffs now seek to limit the holding of *Fisher* to hospitals. In so doing, plaintiffs must concede that *Fisher* controls the question of Georgetown's liability, thus making summary judgment for Georgetown appropriate on these two counts. Plaintiffs argue that *Fisher*'s converse rule should apply to blood banks like the ARC, rather ingeniously focussing on the business aspects of blood banking in an attempt to show that the provision of blood to hospitals is a profitable transaction such that products liability theories and the warranties of the Uniform Commercial Code should be held to apply. Plaintiffs' Memorandum in Opposition to ARC's Motion for Summary Judgment at 87–88. Plaintiffs also note that the District of Columbia is one of only four jurisdictions that have not legislatively barred the application of products liability theories to blood and blood products. Plaintiffs' Opposition at 100. *See supra*, 23 San Diego L.Rev at 882 n. 36 (citing statutes). They contend that in the absence of this legislative action, those theories should be applied.

Plaintiffs' arguments must be rejected, since there is no principled basis on which to limit *Fisher*'s holding to hospitals alone. The *Fisher* case represents a reasoned public policy decision which applies with equal if not greater force to the facts of this case, and to the ARC as a defendant. Moreover, in searching for an appropriate public policy regarding liability of a blood bank for provision of blood to hospitals, the court should be guided by the fact that every state except one has barred such liability, based on a concern for the adequacy of the nation's blood supply. Rather than reaching a contrary result because the District of Columbia has no 'blood shield statute,' the court should clarify the *Fisher* holding to be coextensive with these 47 legislative and two judicial enactments of sound public policy.

To begin with, the scientific rationale for *Fisher* is squarely applicable here. The state of medical knowledge about AIDS at the time of Matthew's transfusion was even less advanced than was medical knowledge of hepatitis at the time of the *Fisher* opinion. *See supra* at 1051–1052. There was not even a consensus of the medical community as to the fact that AIDS was transmitted by a blood-borne viral agent, much less identification of that agent or of a test to screen it out of the blood supply. Thus, the *Fisher* court's emphasis on the "scientific inability to screen all carriers ... despite due care," 403 A.2d at 1133, as a reason for refusing to label blood 'unreasonably dangerous' compels a similar result with respect to the ARC's provision of blood prior to the development of the ELISA test for exposure to AIDS. It is relevant that the court in *Fisher* applied Comment K to § 402A of the Restatement (Second) of Torts, which excludes from strict liability:

> those products, drugs in particular, which in the present state of human knowledge, are incapable of being made safe for their intended and ordinary use (*i.e.* rabies vaccine), but where existing medical experience justifies the marketing and use of the product despite the risk.

403 A.2d at 1134. This language is in no way limited to hospitals as providers, and applies equally cogently to the ARC in the context of AIDS in blood in 1983.

The inability to detect the 'defect' in blood was also one of the *Fisher* court's grounds for rejecting plaintiff's conception of the provision of blood by plaintiff hospital as a sale. *Id.* The court plainly held that "the furnishing of blood is more in the nature of a service than of a sale of goods," in part because to hold otherwise would force the supplier of blood into the role of insurer, which the court declined to do. This reasoning again applies equally well to the ARC as to hospitals.

In sum, there is nothing in the language of *Fisher* to suggest that the court would have reached a different result had the defendant been a blood bank and not a hospital. The policy considerations are all relevant to the case before this court, and

compel summary judgment for both Georgetown and the ARC. This result is consonant with that of nearly every jurisdiction, and avoids the aberrational result that the ARC would be strictly liable in the District of Columbia for conduct that would not be actionable in 49 of our 50 states.

In so holding, the court need not address the ARC's alternative theory of immunity from strict liability under federal law.

## VI. *The District of Columbia Consumer Protection Act*

Finally, plaintiffs contend that defendants are liable under the District of Columbia Consumer Protection Procedures Act ("DCCPPA" or "the Act"), enacted at D.C. Code § 28–3901 *et seq.* (1981 & Supp.1985). Plaintiffs' theory is that defendants' failure to warn them of the risk of AIDS, or to inform them that the blood Matthew received was "from a contaminated source and below [the expected] standard of quality" constituted an unfair trade practice within the ambit of the DCCPPA. Plaintiffs' Amended Complaint, Count VII.

In order to succeed on this theory, plaintiffs must surmount several threshold problems. First, plaintiffs must show that defendants are within the scope of the DCCPPA. To do so, plaintiffs must show that defendants are "merchants" under the Act, D.C.Code § 28–3901(a)(3), and that their activities constituted "trade practices." D.C.Code § 28–3901(a)(6). A "trade practice" is defined as:

> any act which does or would create, alter, repair furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, *a sale, lease or transfer, of consumer goods or services*

*Id.* (emphasis added). "Goods and services" are in turn defined as "any and all parts of the economic output of society." Plaintiffs must fit the acts of the ARC and Georgetown into these statutory definitions in order to prevail.

In addition, plaintiffs must overcome the holding of the District of Columbia Court of Appeals in *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory School,* 514 A.2d 1152 (1986). In that case,

the court declined to apply the DCCPPA to defendant, a religious secondary school, reasoning that "clearly, a non-profit educational institution is not a 'merchant' within the context of the Consumer Protection Procedures Act." *Id.* at 1159. In its brief opinion, the court did not express a view on other types of non-profit entities, but did make clear that the DCCPPA was to be limited to "trade practices arising only out of consumer-merchant relationships." *Id.*

Plaintiffs contend that both defendants are "merchants" under the Act because the ARC charges Georgetown for the provision of blood, and Georgetown passes those charges on to its patients who receive blood in the course of their treatment. Once again, plaintiffs make much of the business aspect of the ARC, focussing on its management and balance sheets in order to convince the court that blood banking is a business, that the ARC is a merchant, and that blood is a part of the economic output of society.

This approach is strained and should be rejected. As the court noted in *Fisher,* when it declined to characterize the provision of blood as a sale of goods for warranty purposes, it is "unnatural" to "forc[e] a blood transfusion into the commercial sales mold." 403 A.2d at 1134. The type of injury which the DCCPPA seeks to redress is not the provision of blood by non-profit blood banks like the ARC. The holding of *Save Immaculata* is helpful in this context: just as a non-profit educational institution's conduct should not be forced into a commercial mold, so also the conduct of the ARC in supplying blood should not be considered covered by the Act.

That the ARC assesses charges for the provision of blood is not determinative of its identity as a "merchant" under the Act. Certainly, the Immacualta Preparatory School charges its students fees for attending, yet these fees did not make that otherwise non-profit entity into a "merchant." Plaintiffs' focus on the minutes of ARC board meetings and annual reports is also inapposite. Many if not all non-profit entities are organized and run with traditional

principles of sound business management in mind, not to turn a profit, but to survive and continue to perform whatever functions they were founded to perform. That this is so does not alone make them "merchants," nor does it make application of the DCCPPA to their conduct appropriate, especially in light of *Save Immaculata.*

█ In addition, to the extent that plaintiffs' allegations under the DCCPPA incorporate previously discussed theories of lack of informed consent and negligence, they are equally unmeritorious in the context of this statute. It has already been shown that risk of AIDS was not a material risk at the time of Matthew's transfusion, thus failure to discuss it with the Kozups cannot make either defendant liable under the DCCPPA. Similarly, it has already been shown that the standard of care for hospitals and blood banks at the time of Matthew's transfusions did not require either defendant to screen donors or use surrogate laboratory tests to eliminate the risk of AIDS contamination. Because defendants are not liable under any of these common law theories, they are equally exempt from liability for the same conduct despite the special statutory provision on which plaintiffs rely. Thus, both as to threshold matters and on the merits, defendants are entitled to summary judgment on plaintiffs' DCCPPA claims (Count VII of Plaintiffs' Amended Complaint).

### VII. *Conclusion*

Because none of plaintiffs' substantive causes of action withstand defendants' Motions for Summary Judgment, the court need not address the question of plaintiffs' special damage allegations, in Counts VIII and XI.

In granting summary judgment, the court is mindful of the terrible personal tragedy that Matthew's struggle with AIDS must have been for the Kozup family. Theirs is an especially frustrating loss because it was not long after Matthew's infection with the disease that the medical community made a number of important AIDS-related breakthroughs in rapid succession. It can only be hoped that these discoveries will save others the pain that plaintiffs have suffered, and that, toward that end, the efforts of both defendants will play a significant role.

An appropriate Order accompanies this Memorandum.

### ORDER

This matter came before the court on the Motions of defendants Georgetown University and The American Red Cross for Summary Judgment. Upon consideration of the motions, the oppositions thereto, and the entire record herein, and for the reasons stated in the accompanying Memorandum, it is by the court this 7th day of July, 1987,

ORDERED that the Motion of Defendant Georgetown University for Summary Judgment is granted; and it is further

ORDERED that the Motion of Defendant The American Red Cross for Summary Judgment is granted; and it is further

ORDERED, ADJUDGED, AND DECREED that summary judgment be and hereby is entered in favor of defendant Georgetown University as to each count of Plaintiffs' Amended Complaint; and it is further

ORDERED, ADJUDGED, AND DECREED that summary judgment be and hereby is entered in favor of defendant The American Red cross as to each count of Plaintiffs' Amended Complaint.