**William GIORNO**

v.

**TEMPLE UNIVERSITY HOSPITAL, Dr. Juan A. Asensio, Dr. Robert Korn, Dr. Garber Scott, Dr. John Hopkins, and American Red Cross.**

Civ. A. No. 93–3394.

United States District Court, E.D. Pennsylvania.

Jan. 3, 1995.

Dennis M. Abrams, David P. Bergers, Lowenthal and Abrams, Bala Cynwyd, PA, for William Giorno.

Roland J. Atkins, Atkins & Cohen, Philadelphia, PA, for Temple University Hosp., Dr. Juan A. Asensio, Dr. Robert Korn, Dr. Garber Scott, Dr. John Hopkins, for defendant.

Thomas P. Wagner, Lois De Antonio, Rawle & Henderson, Philadelphia, PA, for American Red Cross.

### MEMORANDUM

JAMES McGIRR KELLY, District Judge.

Presently before the court is Defendant American Red Cross's ("defendant") Motion for Summary Judgment. Plaintiff commenced this action in the Philadelphia Court of Common Pleas on May 20, 1993. Defendant Red Cross removed the case to this court on June 24, 1993. This court has jurisdiction under 28 U.S.C. § 1332. For the following reasons, the Summary Judgment Motion is granted.

### STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This court is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor. *See id.* at 255, 106 S.Ct. at 2513–14. Furthermore, while the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### FACTUAL AND PROCEDURAL HISTORY

Plaintiff William Giorno ("plaintiff") was injured in an automobile accident on March 28, 1991. He was taken to Temple University Hospital ("Temple") on that day, and remained there until May 4, 1991. During that period, Temple doctors and hospital personnel gave plaintiff a total of eight (8) blood

transfusions. The American Red Cross ("Red Cross" or "defendant") supplied the blood that the doctors transfused into the plaintiff.

On or about July 1, 1991, plaintiff discovered that he had contracted the Hepatitis "C" virus ("HCV"). Plaintiff believed that he acquired the virus from one of the blood transfusions. Therefore, he commenced this action against Temple, the Red Cross, and the physicians who treated him. The complaint set forth the following claims against the Red Cross: 1) strict liability and breach of implied warranty for providing contaminated blood; 2) failure to obtain plaintiff's informed consent prior to the blood transfusions; and 3) negligence in screening and testing blood donors, and failing to address problems in the blood transfusion industry. *See Complaint* at ¶¶ 78–83.

During discovery, the Red Cross voluntarily tested all of the donors who had provided blood to the plaintiff. The Red Cross used the Second Generation Immunoassay HCV Test ("HCV 2.0") on these donors. This test was not in existence at the time the donors gave the blood that plaintiff received. The test revealed that one of the donors was HCV-positive, and may have been at the time of the relevant donation. This donor is hereinafter referred to as Donor # 7.

The Red Cross moved for summary judgment on January 25, 1994. It argued that the Pennsylvania Blood Shield Statute barred plaintiff's strict liability and breach of implied warranty claims. *See* 42 Pa.C.S.A. § 8333; *Cutler v. Graduate Hospital,* 717 F.Supp. 338 (E.D.Pa.1989). The Red Cross also claimed that it had no duty to obtain plaintiff's informed consent, and therefore could not be liable under such a theory. *See e.g. Jones v. Philadelphia College of Osteopathic Medicine,* 813 F.Supp. 1125 (E.D.Pa. 1993).

In its response brief, plaintiff conceded and withdrew the strict liability, breach of warranty and informed consent claims. Therefore, the only remaining claims against the Red Cross are those grounded in negligence.

## DISCUSSION

### 1. The applicable standard of care.

▮ The Red Cross's blood collection activities constitute a professional health service. Therefore, the organization is held to a professional standard of care, and not the typical "reasonable person" negligence standard. *Seitzinger v. The American Red Cross,* 1992 WL 361700 (E.D.Pa.1992); *Kozup v. Georgetown University,* 663 F.Supp. 1048, 1057 (D.D.C.1987). Under the professional standard of care, the defendant is negligent only if it failed to comply with its profession's conventional safety standards and procedures. *Seitzinger,* at *5.

▮ Professional blood banking safety standards are defined in Food and Drug Administration Regulations ("FDA Regulations") and American Association of Blood Banks Standards ("AABB *Standards*"). *Smythe v. Am. Red Cross Blood Services,* 797 F.Supp. 147, 153 (N.D.N.Y.1992); *Seitzinger,* at *6. Accordingly, to prevail under a negligence theory, plaintiff must establish that the Red Cross failed to comply with the safety standards promulgated by these two organizations.

### 2. Defendant's screening and testing methods complied with the professional standard of care.

▮ Plaintiff argues that the Red Cross "failed to use the safeguards and tests available in 1991 to effectively screen out the Hepatitis C antibodies". *Complaint* ¶ 81(c). Under this theory, the Red Cross is liable only if it failed to comply with the AABB *Standards* and FDA Regulations governing screening and testing.

The FDA and AABB require blood banks to screen donors in the following manner: 1) physically examine the donor; 2) ensure that the donor has never had viral hepatitis, or had close contact with a hepatitis-infected individual within the past six months; and 3) ensure that the donor has not had a blood transfusion within six months prior to the donation. *See* 21 C.F.R. 640.3(b)(1)–(c)(7); *see also* AABB *Standards* B1.250–B1.261.

The screening records of Donor # 7 indicate that the Red Cross fully complied with

each of the aforementioned screening requirements. The records confirm that Donor # 7 stated that he never had hepatitis, had not been in contact with a hepatitis carrier, and had not received a blood transfusion within the prior six months. Additionally, Donor # 7 indicated that he never used injectable drugs, and never had sexual contact with an intravenous drug user. *See* Def.Mot. for Summ.J., Exh. 6. It is therefore obvious that the Red Cross performed the professionally required screening procedures on Donor # 7. According to those procedures, it appeared that Donor # 7 was not infected with Hepatitis C. Therefore, as a matter of law, the Red Cross did not screen Donor # 7 in a negligent fashion.

Furthermore, the Red Cross did not negligently test Donor # 7's blood. At the time of the relevant donation, three tests could reduce the risk of HCV transmission via blood transfusions. The most accurate test was the First Generation Immunoassay HCV Test ("HCV 1.0 test"). The other available tests were the Antibody Hepatitis B Core Antigen test ("anti-HBc"), and the ALT liver enzyme test ("ALT").[1] The AABB *Standards* required blood banks to perform the "the most specific" test, which was the HCV 1.0 test. *AABB Standards for Blood Banks and Transfusion Services, 13th Edition*, B5.520. The FDA regulations did not require performance of any of these tests. *See* 21 C.F.R. § 640.5.

It is undisputed that the Red Cross performed the HCV 1.0, ALT, and anti-HBc tests Donor # 7's blood. It is also clear that each of these tests indicated that Donor # 7 was not infected. *See* Def.Mot. for Summ.J., Exh. 6; and Def.Supp.Mem. of Law, Exh. B; *see also* Affidavit of Dr. Paul Holland, dated December 21, 1994.[2] In other words, the Red Cross performed all of the professionally required state-of-the-art tests on Donor # 7's blood, and each of these tests indicated that

the blood was not infected. Based on those tests, and their results, the Red Cross was not negligent in providing Donor # 7's blood for transfusion into the plaintiff.

### 3. This court will not hold the Red Cross to a "super-standard" of care.

 Plaintiff also contends that the blood banking profession's safety standards were themselves deficient, and therefore defendant's compliance with these standards may not have been objectively reasonable. It is true that where a profession has "lagged behind" in adopting reasonable safety procedures, adherence to professional custom is not conclusive on the issue of negligence. *Seitzinger v. American Red Cross,* 1992 WL 361700 (E.D.Pa.1992); *Smythe,* 797 F.Supp. at 152–53. However, if the plaintiff can not offer proof that professional custom was objectively unreasonable, the court will not hold the defendant to a unique and vaguely defined "super-standard" of care. *Kozup,* 663 F.Supp. at 1057.

In this case, plaintiff has not shown that the blood bank industry's safety standards were deficient in 1991. Nor has he established that the industry "lagged behind" in adopting procedures to detect HCV-infected blood. To the contrary, there is ample evidence that blood collection organizations such as the Red Cross have been at the forefront in implementing procedures to defend against transfusion-transmitted blood diseases.[3] *See e.g. Smythe,* 797 F.Supp. at 152–53. Accordingly, plaintiff's attempt to hold the Red Cross to a unique "super-standard" of care is denied, and judgment is granted in favor of the Red Cross on this claim.

### 4. Defendant is entitled to summary judgment on Plaintiff's "failure to educate" claim.

 Plaintiff finally maintains the Red Cross failed to properly educate Temple Uni-

---

1. At the time of Donor # 7's donations, the HCV 2.0 test had not been approved by the FDA, and was not available for use.

2. Plaintiff's medical expert, Dr. R. Benjamin Dawson, submitted an affidavit in which he agreed that Donor # 7's anti-HBc tests indicated that he was not infected with Hepatitis at the time of the donations.

3. For example, the Red Cross began using the First Generation Immunoassay HCV test immediately after the FDA approved the test, and even before federal regulations required its utilization. *See* Def.Mot. for Summ.Jud., at p. 7, and at Exh. B. ¶ 14. Moreover, the blood bank industry implemented the HCV 2.0 test within days of FDA approval. *See* Def.Mot. for Summ.Jud., at Exh. 14.

versity doctors regarding the availability and benefits of directed blood donations. *See* Pl.'s Supp.Resp., at 2–3. A directed blood donation is one which a friend or family member provides for direct transfusion into the patient. According to the plaintiff, members of his family asked the defendant doctors if they could donate blood for his transfusions. The doctors informed these family members that there was not enough time for directed donations. The family members first inquired about directed donations on March 31, 1993. Plaintiff did not receive the infected transfusion until April 7, 1993. With directed donations, the blood is available for transfusion within one to four days after the donation. Thus, it seems the doctors erroneously stated that there was insufficient time to perform directed donations.

Plaintiff argues that if the Red Cross had properly educated Temple doctors of the benefits and time limitations of this process, the doctors might have recommended directed donations. Consequently, plaintiff argues, he may not have been exposed to the infected blood.[4] To survive summary judgment on this claim, plaintiff must first establish that the professional safety standards placed a "duty to educate" on the Red Cross. The plaintiff can not do this.

None of the FDA Regulations or AABB *Standards* require blood collection agencies to educate doctors about directed donation programs. Furthermore, according to the Red Cross's blood expert, Dr. Paul Holland, no such professional duty exists. Dr. Holland has been the Medical Director/Chief Executive Officer of the Sacramento Medical Foundation Blood Center ("SMFBC") for over ten years. At SMFBC, he is responsible for insuring that the Center's blood testing and screening procedures met all applicable professional standards. He clearly stated in his affidavit:

The standard practice, procedure and custom of the blood bank profession in 1991, as now, did not impose a duty upon the Red Cross to instruct area physicians regarding policies of its directed donor program.

*Affidavit of Dr. Paul Holland* ¶ 6.

Finally, the plaintiff does not present any convincing evidence that this duty exists. His only support for this theory is a law review article by an economist, Dr. Ross Eckert. In the article, Eckert opines that blood banks should educate hospitals regarding safety developments in the blood transfusion industry. Eckert, *The Aids Blood Transfusion Cases: A Legal and Economic Analysis of Liability*, 29(1) San Diego L.Rev. 203 (1992). However, Dr. Eckert is not a medical doctor. Also, the article clearly disclaims: "the views that I have expressed in this article are in my private capacity as a nonmedical specialist on the bloodbanking industry, and no official support or endorsement by the FDA is intended or should be inferred". *See* Eckert, at 203, n. *. In other words, Eckert merely states that in his opinion, blood banks should educate hospitals. He does not profess, and in fact clearly disclaims, that his suggestions represent the blood banking industry's professional standard of care.

Plaintiff has therefore not offered any proof that the blood industry's professional safety standards placed a "duty to educate" on the Red Cross. Furthermore, the AABB *Standards*, FDA Regulations, and expert testimony demonstrate that no such duty exists. Plaintiff has therefore failed to establish the existence of a professional duty, which is a necessary element of his claim. As a result, the Red Cross is entitled to summary judgment on plaintiff's "failure to educate" claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (defendant is entitled to summary

---

4. Plaintiff advanced this argument by way of a second expert report of Dr. R. Benjamin Dawson, filed on October 28, 1994. This was five months after the deadline for filing expert reports, and nearly two months after the close of discovery. A court may exclude late expert testimony of this type if it would unduly prejudice the opposing party, *Thibeault v. Square D. Company*,

960 F.2d 239, 246–47 (1st Cir.1992), or if filed in violation of a scheduling order. *Perkasie Industries Corp. v. Advance Transformer, Inc.*, 143 F.R.D. 73, 76 (E.D.Pa.1992). Accordingly, even if the claim had any basis in law, this court would have prevented plaintiff from advancing this theory at trial.

judgment where the plaintiff fails to establish the existence of an essential element of his claim.)

## CONCLUSION

The Red Cross was not negligent in screening and testing Donor #7's blood. Moreover, the Red Cross did not have a duty to educate Temple University doctors about its directed donor program, and thus can not be held liable under such a theory. Accordingly, summary judgment is granted in favor of the Red Cross.

An appropriate Order follows.

## ORDER

AND NOW, on this 3rd day of January, 1995, upon consideration of the Defendant Red Cross's ("Defendant") Motion for Summary Judgment, the Plaintiff William Giorno's ("Plaintiff") Response, and all replies and supplemental responses thereto, this court ORDERS that the Defendant's Motion is GRANTED and Judgment is entered in favor of the Defendant and against the Plaintiff.