368 So.2d 1219 (1979)
Cheryl Rodriguez TUFARO, wife of/and Paul Tufaro
v.
METHODIST HOSPITAL, INC., et al.
No. 9858.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 1979.
Edward S. Bopp, Ronald A. Welcker, Arabi, for plaintiffs-appellants.
Lemle, Kelleher, Kohlmeyer & Matthews, David S. Kelly, William S. Penick, New Orleans, for defendants-appellees.
Before SAMUEL, STOULIG and BOUTALL, JJ.
STOULIG, Judge.
Appellant Cheryl Rodriguez Tufaro, wife of Paul Tufaro, contracted malaria from blood she received through transfusion which undergoing surgery at Methodist Hospital in New Orleans. She and her husband filed suit for damages against Blood Services of Texas, Inc., doing business as Blood Services of New Orleans (Blood Services), and Dr. A. T. Hunt, its medical director, alleging both defendants were liable because the blood bank staff was negligent in screening prospective donors from whom the infected blood given to plaintiff was collected.[1] Plaintiffs have appealed the judgment dismissing their suit.
Defendants admit plaintiff's malaria was transfusion-induced as she avers and concede the four units she received were furnished by Blood Services. The issue before us is whether either defendant has breached a duty of care owed to Mrs. Tufaro as a donee in failing to detect the malaria strain in the whole blood she received.
From the medical evidence we learn that the occurrence of malaria in the United States is rare[2] while instances of transfusion-induced malaria, miniscule. The statistics demonstrate the accuracy of this generalization. Dr. Robert Treuting, an expert clinical and anatomical pathologist testifying on behalf of plaintiffs, stated that approximately *1220 10 million blood transfusions are administered in this country annually and the literature to which all counsel allude reflects that only 37 cases of transfusion-induced malaria were reported in this country between 1958 and 1972.
Although the disease is rare, its potential presence in blood concerns blood bank personnel who include questions in the screening interview that would eliminate any possible carrier as a donor. The questions routinely asked to detect the malaria potential are included in a standardized inquiry concerning illnesses and relevant medical history made of all donors to determine the eligibility of each to donate. The interview procedure and other techniques employed in operating a blood bank as a rule are formulated according to guidelines established by two national organizations that license centers which meet the standards they set.
The American Association of Blood Banks (A.A.B.B.) is a voluntary association of hospital and community blood banks throughout the United States that additionally has affiliate members in other countries. The National Institute of Health (N.I.H.), inter alia, establishes standards for centers that collect blood distributed in interstate commerce. Defendant Blood Services was licensed by both.
The medical experts agree that in June 1972, when the blood given to Mrs. Tufaro was collected, no blood bank in the country had a clinical test available to rule out the presence of the malaria infection in donated blood. The donor interview was the only available method to screen out malaria carriers.
A.A.B.B. guidelines established the following criteria for technicians to decide the acceptability or nonacceptability of the donor: (1) Anyone with a history of malaria was rejected. (2) A United States citizen who visited a country where malaria was prevalentan endemic countrywas acceptable six months after his return to the United States provided he had not taken antimalarial drugs. (3) Any person taking antimalarial drugs was excluded for three years after having used the medication. (4) All military personnel who served in an endemic area were excluded for three years after their return.
Defense expert Dr. Ralph Hartwell, a past president of the A.A.B.B. and a practicing pathologist in the New Orleans area who has a subspecialty in blood banking, was most impressive. Based on his review of the donor interview cards utilized in collecting the blood of the four donors from whom the questionable units were taken and the procedure manual utilized by Blood Services staff at the time, Dr. Hartwell stated the blood bank staff operated within the guidelines established by A.A.B.B. This opinion, of course, is based on the assumption that the screening staff did follow the established procedure.
Unfortunately, the members of the staff at Blood Services on duty when the blood at issue was collected could not be located at the time of the trial. This particular blood bank discontinued operations in 1974 because it was requisitioning more blood from other centers that it was furnishing. In short it became a deficit operation. Defense counsel explained what efforts were made to contact the staff and we are satisfied due diligence was used. Further, it is unlikely that the people involved in the screening would remember the individual interviews because so many were routinely conducted and five years had elapsed between the collection and the trial of this case.
Plaintiffs were able to locate two of the four donors, who testified on their behalf. They were commercial donors, having been paid $5 per unit, and their testimony was unimpressive. Independent of any finding of the trial court, we note from reading the record that the selective memory displayed by both raises serious doubts as to their credibility. One was a drifter with a criminal conviction who moved from job to job; the other also failed to display job stability although he had no criminal record. Both testified they were interviewed by a lady at the blood bank; however, it was established that Ted Fontenot, a man, handled the screening interview in both cases. Both *1221 testified they were in the armed services of the United States and had been stationed in Vietnam (an endemic country) within three years of the donation and both assert this information was given to the lady interviewer. If this were true, it would establish the negligence of Blood Services personnel in screening. However, the trial court rejected this evidence on a credibility basis, stating in part in written reasons for judgment:
"Admittedly, the testimony of the two blood donors substantiates in part the plaintiffs' contention that Blood Services failed to obtain a complete and accurate history from the donors prior to taking their blood for purposes of determining whether or not they were carriers of malaria and would subject the defendants, in the absence of further evidence, to an action in damages.
"Nevertheless, a review of the pleadings, testimony, and an evaluation of the credibility of the witnesses and litigants, including the two donors, when considered in its entirety, will not support the plaintiffs' claim, nor lead to the conclusion that evidence preponderates in favor of the plaintiffs.
"In the Court's opinion, the evidence preponderates in favor of the defendants' position that the actions, procedures and practices of the doctor and Blood Services in screening the four donors for malaria complied with the existing standards and practices that prevailed in 1972 among blood banks and the medical profession in this community."
Our review of this finding is limited to a determination of whether the record supports this conclusion. Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La. App. 4th Cir. 1978). Plaintiffs, to prevail, would have had to establish that the donated blood was collected using methods unacceptable to the medical community that did not comply with local standards of competent practice at the time the blood was donated. Or they would have had to prove that Blood Services staff, having an approved procedure available, negligently failed to conduct the screening as directed.
Because a blood transfusion is a medical procedure, the use of which subjects the recipient to certain risks, the standard of care that must be utilized in collecting and transfusing blood is logically the same as that which applies to the actions of physicians and surgeons. In Louisiana the practice actions are controlled by the "locality rule" as expressed in R.S. 9:2794(A)(1):
"In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
"(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty."
Defendants have proved beyond doubt that Blood Services utilized donor screening techniques routinely in use in blood banks throughout the country in June 1972 and that the procedure employed by it for eliminating potential malaria carriers was the only one available. The experts established that contraction of transfusion-induced malaria is one of the remote risks that the recipient of donated blood must undergo to receive the benefits derived from a blood transfusion.
Plaintiffs have failed to prove that risk was increased substantially by the negligence of Blood Services screening staff and the record fully supports this conclusion of the trial court.
For the reasons assigned the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] Several other parties were named as defendants in the original petition but were dismissed later by consent judgment.
[2] Malaria is no longer indigenous to the United States. In 1970 of the 4,000 cases reported, only 16 were contracted in this country and the rest were traceable to foreign sources.