799 F.Supp. 960 (1992)
Kevin Luke SMITH, et al., Plaintiffs,
v.
PASLODE CORPORATION, et al., Defendants.
No. 88-2247C(7).
United States District Court, E.D. Missouri, E.D.
March 16, 1992.
*961 *962 *963 Drew Baebler, Schlichter Law Associates, St. Louis, Mo., for plaintiffs.
Frank Gundlach Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, Mo., Brendan Collins, Arnold & Porter, Washington, D.C., for American Red Cross.
Ronald Willenbrock, Stephen Hoyne, Amelung, Wulff & Willenbrock, St. Louis, Mo., and Bruce Bieneman, Cholette, Perkins and Buchanan, Grand Rapids, Mich., admitted pro hac vice for Paslode Corp., Signode Corp., Signode Supply Corp. and Illinois Tool Works.
Judith St. Pierre, Lashly, Baer & Hamel, St. Louis, Mo., for St. Luke's Episcopal Hosp.

MEMORANDUM AND ORDER
HAMILTON, District Judge.
This matter is before the Court pursuant to the Motion of Paslode Defendants for Partial Summary Judgment, filed February 15, 1991, Defendant American Red Cross's Motion for Summary Judgment, filed February 15, 1991, and Defendant American Red Cross's Motion for Protective Order, filed April 1, 1991.
Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When presented with such a motion, the Court must determine whether any genuine factual issues exist that only the finder of fact can properly resolve since they may reasonably be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are relevant and which are immaterial. Only disputes which might affect the outcome will properly preclude summary judgment. Id. at 248, 106 S.Ct. at 2510. Factual disputes that are irrelevant or unnecessary to the cause of action will not preclude a summary judgment. Id. When evaluating a motion for summary judgment the Court must view the facts in the light most favorable to the party against whom the motion is directed, giving such party the benefit of all reasonable inferences to be drawn from the facts. Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir.1982). The moving party always bears the burden of informing the Court of the basis for the motion. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552-53. However, the party opposing the summary judgment motion may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a material factual dispute. *964 Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.
In their First Amended Complaint, Plaintiffs allege that in November 1983, Kevin Luke Smith was injured when a pneumatic nail gun, manufactured, sold and distributed by the Paslode Defendants, fired a nail through his left hand. As a result of this injury, Kevin Smith underwent surgery and received blood transfusions in December 1983 and September 1984. In August and September 1987, Kevin Smith was diagnosed as infected with the human immuno-deficiency virus (HIV). Plaintiffs allege that one or more of the blood products received by Kevin Smith in 1983 and 1984 and gathered by Defendant American Red Cross (ARC) was infected with the HIV.
In Counts I and II, Kevin Smith charges the Paslode Defendants with products liability and negligence in the manufacture of the nail gun. In Count III, Kevin Smith charges Defendant ARC with several instances of negligence in relation to the blood products provided to him in 1983 and 1984. In Count IV, Constance Smith, wife of Kevin Smith, alleges loss of consortium against both Defendants.

MOTION OF THE PASLODE DEFENDANTS FOR PARTIAL SUMMARY JUDGMENT
The Paslode Defendants move for summary judgment as to Count IV, arguing that since Constance Smith was not married to Kevin Smith at the time of the incident involving the nail gun, she cannot maintain a loss of consortium action against the Paslode Defendants. Constance Smith counters that the HIV condition diagnosed in August and September 1987 was a latent condition which resulted from the nail gun incident; therefore, her cause of action accrued when that condition was diagnosed in August or September 1987, five or six months after her marriage to Kevin Smith on March 7, 1987.
Two independent, separate and distinct causes of action arise when a married person is injured because of the negligence of a third person. Robben v. Peters, 427 S.W.2d 753, 756 (Mo.Ct.App.1968). One action accrues to the injured person for injuries, disabilities and expenses suffered as a direct result of the negligence. Id. A second action accrues to the injured person's spouse for damages suffered due to the loss of the injured person's services, society and companionship. Id. However, this action for loss of a spouse's services, society and companionship is derivative only; therefore, if the injured person has no valid claim for personal injuries, the spouse of the injured person has no right to recover damages flowing from that injury. Elmore v. Illinois Terminal R.R. Co., 301 S.W.2d 44, 47 (Mo.Ct.App.1957).
Generally, claims for loss of consortium based on injuries received prior to marriage are precluded. However, some courts have recognized an exception to this rule, holding that where neither spouse is aware of the tortious conduct or injury at the time of marriage, a loss of consortium claim is still available. Kociemba v. G.D. Searle & Co., 683 F.Supp. 1577, 1578 (D.Minn.1988); Stager v. Schneider, 494 A.2d 1307, 1316 (D.C.Dist.Ct.App.1985); Furby v. Raymark Indus., Inc., 154 Mich. App. 339, 397 N.W.2d 303, 306 (1986). In reaching this determination, the courts reasoned that the claim for loss of consortium could not accrue until the injured spouse's cause of action accrued. Stager, 494 A.2d at 1316. Contra Reichelt v. Johns-Manville Corp., 107 Wash.2d 761, 733 P.2d 530, 538 (1987) (holding that the wife's loss of consortium claim did not necessarily accrue at the same time her husband's negligence claim accrued). Applying the discovery rule which states that an injured person's cause of action does not accrue until the damage is reasonably discoverable or ascertainable, the courts found that the spouse's loss of consortium claim also does not accrue until the injury is reasonably discoverable. Stager, 494 A.2d at 1316; Furby, 397 N.W.2d at 306.
In the present case, Kevin Smith alleges he was injured in November 1983 when a nail was fired through his left hand by a nail gun manufactured by the Paslode Defendants. He underwent surgery for this injury in December 1983 and September *965 1984. Kevin Smith began dating Constance Smith in 1983, prior to the nail gun incident. Kevin and Constance became engaged in June 1986. At that time they began living together. They married on March 7, 1987. From this undisputed evidence, the record is clear that Kevin and Constance Smith were aware at the time of their marriage of the tortious conduct and injury that they attribute to the Paslode Defendants, as distinct from the HIV infection.
Plaintiffs argue for the adoption by this Court of the above-stated exception to the general rule. According to Plaintiffs, that exception should apply in this case since the HIV infection was diagnosed subsequent to their marriage; therefore, the cause of action accrued at the time of the diagnosis. The Court, however, finds it is unnecessary to determine whether this exception should be adopted. Applying this exception would not rescue Constance Smith's loss of consortium claim since Kevin Smith's cause of action against the Paslode Defendants accrued in November 1983, prior to their marriage. At that time, Kevin Smith could reasonably ascertain the tortious conduct and the damage sustained as a result of that conduct. It was at that point that Kevin Smith's right to commence an action arose. See Renfroe v. Eli Lilly & Co., 686 F.2d 642, 647 (8th Cir.1982); West v. Atlas Chemical Indus., Inc., 264 F.Supp. 697, 700 (E.D.Mo.1966) (citing Rippe v. Sutter, 292 S.W.2d 86, 90 (Mo. 1956)); Knight v. M.H. Siegfried Real Estate, Inc., 647 S.W.2d 811, 814 (Mo.Ct.App. 1982). Although the HIV infection was arguably a latent condition not reasonably ascertainable prior to August or September 1987, the element of damage was established previously when the nail injured Kevin Smith's hand. Therefore, the HIV infection constituted additional damage, but did not create a new and separate cause of action against the Paslode Defendants.
Since Constance Smith was not married to Kevin Smith at the time his cause of action against the Paslode Defendants accrued, she may not maintain a loss of consortium claim against those defendants. Therefore, the Motion of Paslode Defendants for Partial Summary Judgment is granted.

MOTION OF DEFENDANT AMERICAN RED CROSS FOR SUMMARY JUDGMENT
In its motion, Defendant ARC asserts that it is entitled to summary judgment since it satisfied the generally recognized and accepted practices of blood bank professionals when it collected and processed the blood received by Kevin Smith. Moreover, ARC contends that Plaintiffs' experts are not qualified to testify as to the applicable standard of care in the blood banking profession. Alternatively, ARC contends that its alleged negligence was not the proximate cause of Plaintiffs' injuries and that strict liability and implied warranties do not apply to the collection and processing of blood products in Missouri. Finally, ARC asserts that Plaintiffs' action is barred by the applicable statute of limitations.
Plaintiffs and the Paslode Defendants counter that the professional standard of care which applies in actions against physicians and hospitals does not apply to the ARC. Rather, they contend that the ordinary standard of care applies, requiring the ARC to use the degree of care an ordinarily careful and prudent person would use under the same circumstances. However, they assert that even applying the professional standard, ARC was negligent in failing to implement a surrogate test to screen high risk blood and in failing to utilize a more aggressive, confrontational interview to screen high risk donors. Further, they claim that ARC was negligent in failing to follow up the blood samples and donors to determine if any were infected with HIV and, if so, to relay this information to the recipient of the blood. Rather than contending that ARC failed to comply with the prevailing standard of care, Plaintiffs and Paslode assert that the blood-banking industry as a whole was negligent in not elevating its standards to include these protective measures.
*966 To determine the appropriate standard of care and the applicable statute of limitations in this case, the Court first must determine whether ARC qualifies as a health care professional. Under Missouri law, all negligence actions related to health care against an entity providing health care services must be brought within two years of the complained of negligence. Mo.Ann. Stat. § 516.105 (Vernon Supp.1991). Due to the medical expertise blood banks exercise in performing their duties, many jurisdictions have adopted the view that blood banks are health care professionals. See, e.g., Tufaro v. Methodist Hosp., 368 So.2d 1219, 1221 (La.Ct.App.1979); Doe v. American Red Cross Blood Servs., 297 S.C. 430, 377 S.E.2d 323, 326 (1989); Hernandez v. Nueces County Medical Soc'y Community Blood Bank, 779 S.W.2d 867, 870-71 (Tex.Ct.App.1989). But see Quintana v. United Blood Servs., 811 P.2d 424 (Col.Ct. App.1991), cert. granted, (June 3, 1991) (holding that ordinary principles of negligence, rather than a professional standard of care, applies to claims of negligence against a blood bank).
In Missouri, the procurement, processing, distribution or use of blood, blood products and blood derivatives for transfusion into the human body is a service. Mo. Ann.Stat. § 431.069 (Vernon Supp.1991). Further, the uncontradicted evidence in the present case shows that nearly every step in the ARC's collection, processing and distribution of blood requires medical expertise. (Sandler Aff. at par. 5). Blood donors are screened through medical histories and limited physical examinations conducted by, or under the supervision of, licensed health care professionals. Id. Blood is drawn by a phlebotomy, a medical procedure. Id. It is then subjected to various laboratory tests to determine type as well as the existence of various impurities. Id. Finally, it is separated into different components and specially processed, stored and distributed for transfusion therapy. Id.
Because ARC utilizes extensive medical expertise in providing the service of blood procurement, processing and distribution, the Court finds that ARC is a health care professional providing health care services. As stated above, a negligence action related to health care brought against an entity providing health care services must be brought within two years of the complained of negligence. Mo.Ann. Stat. § 516.105 (Vernon Supp.1991). In the present case, Kevin Smith was transfused with blood in November 1983 and September 1984. He filed the present action against ARC on August 28, 1989, more than two years after the complained of negligence. Plaintiffs contend, however, that the HIV was a foreign object injected into Kevin Smith's body and, therefore, should fall within the foreign object exception to the two year statute of limitations. That exception states:
[I]n cases where the act of neglect complained of its (sic) introducing and negligently permitting any foreign object to remain within the body of a living person, the action shall be brought within two years from the date of the discovery of such alleged negligence, or from the date on which the patient in the exercise of ordinary care should have discovered such alleged negligence, whichever date first occurs....
Id. This exception does not apply, however, where a foreign object is intentionally introduced in the body and is intended to remain there. Hershley v. Brown, 655 S.W.2d 671, 675 (Mo.Ct.App.1983).
In the present case, the Court need not determine whether the HIV was a foreign object within the exception stated above. Kevin Smith first tested positive for HIV on August 19, 1987. (Ex. 2 attached to Plaintiffs' Reply Brief to Reply Brief of ARC). It was on that date that Plaintiffs did or should have discovered ARC's alleged negligence. Plaintiffs filed their First Amended Complaint, alleging negligence on the part of ARC for the first time, on August 28, 1989, more than two years after the positive HIV test. Therefore, even applying the foreign object exception, Plaintiff Kevin Smith's claim of negligence against ARC is barred by the applicable two year statute of limitations. Further, Constance Smith's derivative claim for loss of consortium against ARC *967 must also be dismissed since Kevin Smith has no right to recover damages against ARC. See Elmore v. Illinois terminal R.R. Co., 301 S.W.2d 44, 47 (Mo.Ct.App. 1957).
For the reasons stated above, ARC's motion for summary judgment is granted. In view of this holding, the Court does not reach the merits of Plaintiffs' claims against ARC.
Accordingly,
IT IS HEREBY ORDERED that the Motion of Paslode Defendants for Partial Summary Judgment is GRANTED. Plaintiff Constance Smith's claim against the Paslode Defendants, contained in Count IV, is DISMISSED.
IT IS FURTHER ORDERED that Defendant American Red Cross's Motion for Summary Judgment is GRANTED. Plaintiffs' claims against Defendant American National Red Cross, contained in Counts III and IV, are DISMISSED.
IT IS FURTHER ORDERED that Defendant American Red Cross's Motion for Protective Order is DENIED as moot.

ON MOTION TO ALTER OR AMEND AND REQUEST FOR CLARIFICATION
This matter is before the Court pursuant to Plaintiffs' Rule 59(e) Motion to Alter or Amend Court Order of March 16, 1992, filed March 26, 1992, and Third Party Defendant American Red Cross's Request for Clarification as to this Court's Grant of Summary Judgment for the Red Cross, filed March 25, 1992.
In their First Amended Complaint, Plaintiffs allege that in November 1983, Kevin Luke Smith was injured when a pneumatic nail gun, manufactured, sold and distributed by the Paslode Defendants, fired a nail through his left hand. As a result of this injury, Kevin Smith underwent surgery and received blood transfusions in December 1983 and September 1984. In August and September 1987, Kevin Smith was diagnosed as infected with the human immuno-deficiency virus (HIV). Plaintiffs allege that one or more of the blood products received by Kevin Smith in 1983 and 1984 and gathered by Defendant American Red Cross (ARC) was infected with the HIV.
In Counts I and II, Kevin Smith charges the Paslode Defendants with products liability and negligence in the manufacture of the nail gun. In Count III, Kevin Smith charges Defendant ARC with several instances of negligence in relation to the blood products provided to him in 1983 and 1984. In Count IV, Constance Smith, wife of Kevin Smith, alleges loss of consortium against both Defendants.

MOTION OF PLAINTIFFS TO ALTER OR AMEND
On March 16, 1992, the Court filed its Memorandum and Order granting summary judgment in favor of ARC and against Plaintiffs. In that decision, the Court found that Plaintiffs' claims against ARC were barred by the two year statute of limitations applicable to actions relating to health care against a health care provider. See Mo.Ann.Stat. § 516.105 (Vernon Supp.1991). Although Plaintiffs urged the Court to apply the foreign objects exception to the statute of limitations, the Court declined to rule on that issue. Instead, the Court, relying on an exhibit provided by Plaintiffs, determined that Plaintiff Kevin Smith did or should have discovered ARC's alleged negligence on August 19, 1987. (See Ex. 2 attached to Plaintiffs' Reply Brief to Reply Brief of ARC). Since Plaintiffs filed their First Amended Complaint, alleging negligence on the part of ARC for the first time, on August 28, 1989, the Court determined that even applying the exception, Plaintiffs' action was time-barred.
Plaintiffs now move the Court to alter or amend the March 16, 1992 Memorandum and Order, claiming that the exhibit relied on by the Court was inaccurate. According to Plaintiffs, the earliest date on which Plaintiff Kevin Smith did or should have known of the HIV was August 31, 1987. Therefore, Plaintiffs argue that their action against ARC is not time-barred. Since an error was made in determining the date of Plaintiff Kevin Smith's diagnosis, the *968 Court grants Plaintiffs' motion to alter or amend.
The Court first notes that its finding that Plaintiff Kevin Smith was transfused with blood in December 1983 and September 1984 remains accurate. Therefore, the alleged negligence occurred in December 1983 or September 1984, more than two years before Plaintiffs' action against ARC was filed. A negligence action related to health care brought against an entity providing health care services must be brought within two years of the complained of negligence. Mo.Ann.Stat. § 516.105 (Vernon Supp.1991).
Plaintiffs' contend, however, that the HIV was a foreign object injected into Kevin Smith's body and, therefore, should fall within the foreign object exception to the two year statute of limitations. That exception states:
[I]n cases where the act of neglect complained of its (sic) introducing and negligently permitting any foreign object to remain within the body of a living person, the action shall be brought within two years from the date of the discovery of such alleged negligence, or from the date on which the patient in the exercise of ordinary care should have discovered such alleged negligence, whichever date first occurs....
Id. The foreign objects exception is normally applied in those situations where foreign objects are left within a patient after surgery. See, e.g., Green v. Washington Univ. Medical Ctr., 761 S.W.2d 688, 690 (Mo.Ct.App.1988); Hershley v. Brown, 655 S.W.2d 671 (Mo.Ct.App.1983). The exception does not apply where a foreign object is intentionally introduced in the body and is intended to remain there. Hershley, 655 S.W.2d at 675.
A blood product used in a transfusion is intentionally introduced into the body of the recipient and, presumably, is intended to remain there. The same holds true for the various components of that blood product. Therefore, the Court finds that a blood contaminant is not a foreign object as that term is used in Section 516.105. Since that exception does not apply, the two year statute of limitations began running at the time the alleged negligent act occurred. In this case, those acts occurred in December 1983 and September 1984, and Plaintiffs' claims are time-barred.

ARC'S MOTION FOR CLARIFICATION
In its March 16, 1992 Memorandum and Order granting summary judgment in favor of ARC and against Plaintiffs, the Court did not grant or deny summary judgment as to the Third Party Complaint of the Paslode Defendants against ARC. ARC now moves for clarification of that Memorandum and Order as to its motion for summary judgment against the Third Party Plaintiffs (the Paslode Defendants). Although in its motion ARC states that the Court granted summary judgment in its favor against the Paslode Defendants, the Court has made no determination as to the Third Party Complaint. In light of this omission, ARC's motion for clarification is granted.
In their Second Amended Third Party Complaint, the Paslode Defendants seek contribution and/or indemnity from ARC. The Paslode Defendants argue that ARC was negligent in failing to implement a surrogate test to screen high risk blood and in failing to utilize a more aggressive, confrontational interview to screen high risk donors. Further, they claim that ARC was negligent in failing to follow up the blood samples and donors to determine if any were infected with HIV and, if so, to relay this information to the recipient of the blood. Rather than contending that ARC failed to comply with the prevailing standard of care, the Paslode Defendants assert that the blood-banking industry as a whole was negligent in not elevating its standards to include these protective measures.
ARC asserts that it is entitled to summary judgment since it satisfied the generally recognized and accepted practices of blood bank professionals when it collected and processed the blood received by Kevin Smith. Moreover, ARC contends that Plaintiffs' and Paslode Defendants' experts are not qualified to testify as to the applicable *969 standard of care in the blood banking profession. Alternatively, ARC contends that its alleged negligence was not the proximate cause of Plaintiffs' injuries and that strict liability and implied warranties do not apply to the collection and processing of blood products in Missouri.

A. STANDARD OF CARE
In its previous Memorandum and Order, the Court determined that ARC is a health care professional. (March 16, 1992 Memorandum and Order, p. 8). As such, ARC is held to a professional standard of care in providing its health care services. Accord Tufaro v. Methodist Hosp., 368 So.2d 1219, 1221 (La.Ct.App.1979); Hutchins v. Blood Servs. of Montana, 161 Mont. 359, 506 P.2d 449, 452 (1973); Hines v. St. Joseph's Hosp., 86 N.M. 763, 527 P.2d 1075, 1078 (Ct.App.1974); Doe v. American Red Cross Blood Servs., 297 S.C. 430, 377 S.E.2d 323, 326 (1989). That standard of care requires ARC to exercise the care commonly exercised by the ordinarily skillful, careful and prudent blood bank in its procurement, processing, distribution and use of blood products under the same or similar conditions. See Byers v. Spaulding, 725 S.W.2d 893, 896 (Mo.Ct.App.1987); Cebula v. Benoit, 652 S.W.2d 304, 307 (Mo. Ct.App.1983) (citing Hart v. Steele, 416 S.W.2d 927 (Mo.1967)).
Health care professionals are entitled to a wide range of discretion, and their actions are not considered negligent unless it is shown that those actions are "clearly against the course recognized as correct by the profession generally." Miller v. Scholl, 594 S.W.2d 324, 328-29 (Mo. Ct.App.1980) (quoting Haase v. Garfinkel, 418 S.W.2d 108, 114 (Mo.1967)). Whether the health care professional's conduct comported with the applicable standard of care must be determined in light of facts existing and known by the professional at the time in question, rather than on the basis of facts revealed by subsequent developments. Id. at 329. The standard of care that a single professional would have comported with is insufficient to support a submission of negligence in a medical malpractice case because the standard of care of a single professional may be higher or lower than the standard of the profession collectively. Id. at 330.

B. DONOR SCREENING
It is undisputed that a test for the detection of HIV was not developed until the spring of 1985. (Decl. of Dr. Marilyn Johnston at par. 17). However, the Paslode Defendants allege ARC was negligent in not adopting a more aggressive donor screening procedure to detect those at high risk for carrying HIV prior to 1985. ARC counters that its screening procedures fully comported with the standard of care applicable in 1983 and 1984.
The undisputed evidence shows that in early 1983 and throughout 1984, the Missouri/Illinois Regional Blood Services (Regional Blood Services) worked to spread the message that high-risk gay males were not acceptable blood donors. (Decl. of Dr. Marilyn Johnston at par. 6). Further, in early 1983, Regional Blood Services began providing potential donors with a pamphlet entitled "What You Should Know About Giving Blood" and an insert entitled "An important message to all blood donors." Id. Donors were instructed to read the pamphlet and insert before donating blood. Moreover, donors were told they would be required to sign a statement indicating that they understood the information contained in the pamphlet and insert. Id. The information's purpose was to aid in preventing the spread of certain illnesses by blood transfusion. Id. The insert described several of these illnesses, including AIDS and hepatitis, and the groups of individuals which, according to the Office of Biologics of the Food and Drug Administration (FDA), were at increased risk of developing AIDS. Id. These groups included:
Persons with symptoms and signs suggestive of AIDS. These include severe night sweats, unexplained fevers, unexpected weight loss, lymphadenopathy (swollen glands), or Kaposi's sarcoma (a rare cancer).
Sexually active homosexual or bisexual men with multiple partners.

*970 Recent Haitian entrants into the United States.
Present or past abusers of intravenous drugs.
Sexual partners of persons at increased risk of AIDS.
Id. at attachment 1. The pamphlet further instructed the potential donor as follows:
If you believe that you may be carrying one of the above-mentioned illnesses, or if you are an individual in a group at increased risk of developing AIDS, we ask that you refrain from donating blood at this time. You may leave now without providing an explanation. Or, if you prefer, you may proceed to be deferred confidentially, without further questioning, by the health history interviewer.
Id.
After determining that the donor had read and understood the pamphlet about AIDS, a nurse asked the donor a series of approximately twenty medical history questions concerning the donor's past and recent medical history. Id. at par. 7; attachment 2. The donor was asked, inter alia:
Have you ever had yellow jaundice, liver disease, hepatitis or a positive blood test for hepatitis?
Have you ever taken self-injected drugs?
Have you in the past six months received blood transfusions, blood injections or tattoos?
Have you in the past six months been exposed to anyone with yellow jaundice, hepatitis, or on a kidney machine?
Have you in the past three years been outside the United States?
Have you ever had any serious illness?
Have you ever been deferred as a blood donor, or had problems donating?
Have you ever had a blood disease or cancer?
Id. at attachment 2. Donors were also required to respond affirmatively to the question, "Are you feeling well today?" Id. Affirmative response were also required to the following statements:
I have read and understand the pamphlet "What You Should Know About Giving Blood."
I have accurately answered each of the above questions and voluntarily donate by blood to the American Red Cross for use as deemed advisable.
Id. Donors then were required to sign the form. Id.
In January 1984, ARC modified its donor screening by adding a procedure which allowed donors to call back the blood center to ask any additional questions or concerns about whether the donor's blood should be used. Id. at attachment 4. Further, the description of one high risk AIDS groups was modified by asking that "[s]exually active homosexual or bisexual men with multiple partners (more than one)" refrain from donating. Id. at par. 7, fn. 1. (emphasis on added language). In addition, the donor was asked whether he had been exposed to anyone with AIDS within the past six months. Id. at attachment 5. Finally, a donor was asked the additional question of whether he had experienced "[r]ecent onset of night sweats, unexplained fever or weight loss, lumps in neck, arm pits, or groin, or discolored areas of skin or mouth?" Id.
Once the medical history was completed, a nurse checked the donor's temperature, pulse, blood pressure and hemoglobin count and examined the donor's arms to confirm that the donor was not taking self-injected drugs or had any infectious skin diseases. Id. at par. 8. After the blood was collected, it was subjected to various laboratory tests, including ABO typing, testing for the presence of the hepatitis B surface antigen, and testing for the presence of syphilis. Id. If these tests were acceptable, a nationwide donor deferral register was checked to ensure that the donor had never previously been deferred from donating. Id.
The Paslode Defendants contend that prior to February 4, 1983, commercial blood collectors instituted a policy of asking persons in high-risk groups to identify themselves. (Opp. to Mot. of ARC for Summary Judgment at p. 6, Ex. 1). Accordingly, they argue that since the ARC's conduct did not comply with what other blood collectors felt was needed, there exists a question *971 of whether ARC was negligent. However, the evidence submitted by the Paslode Defendants fails to outline the screening procedure used by the commercial blood collectors or how that procedure differed from ARC's procedure outlined above. The Paslode Defendants rely on a February 4, 1983 article from the Journal of the American Medical Association,[1] which contains a partial quote from a letter provided to each person who came into the Alpha Therapeutic Corporation, a commercial blood collector, to sell plasma. The quote states:
In past years you have helped us help others through your plasma donations. We are now faced with a situation in which only you can help us ensure a safe product to those whose lives depend on it. Because of our shared goal of producing a continuous and safe supply of plasma products for use worldwide, Alpha has committed its resources to reducing the possibility that this disease might be transmitted through our products. We are now asking for your commitment also.
William A. Check, Preventing AIDS transmission: should blood donors be screened?, 249 JAMA 1743, 1745 (Feb. 4, 1983) (attached as Ex. 1 to Opp. to Mot. of ARC for Summary Judgment). According to the article, "the letter goes on to ask anyone in a `high-risk' group to identify himself or herself to the medical receptionist. The person is offered further information if he or she requests it." Id.
To bolster this evidence of the commercial blood collectors' screening procedures, the Paslode Defendants also offer the minutes of the January 14, 1983 meeting of the National Hemophilia Foundation. Those minutes state that "Alpha indicated the most active screening process, through specific questioning of donors, which had been in effect for three weeks and had already excluded 308 people. Alpha further requires certification on each batch of product that each donor has responded to questions." (Ex. 3 attached to Opp. to Mot. of ARC for Summary Judgment).
This evidence fails to show any substantial difference in screening procedures between the commercial blood collectors (particularly Alpha Therapeutic) and ARC.[2] The evidence does not show that blood bank professionals generally were engaging in a screening procedure different from that procedure used by ARC in 1983 and 1984. To the contrary, the evidence shows that ARC complied with or exceeded the standard of care established by the blood banking profession. (See Decl. of Dr. Marilyn Johnston at par. 9; Decl. of Dr. Kathleen Sazama at par. 7; Decl. of Dr. Ronald Strauss at par. 5; Suppl.Decl. of Dennis Donohue, M.D. at par. 4; Suppl.Decl. of Kathleen Sazama, M.D. at par. 5). However, the exhibits provided by the Paslode Defendants illustrate the debate within the profession as of February 1983 as to whether HIV was even transmittable by blood transfusions and, if so, the appropriate measures to be taken to prevent its spread. Accordingly, the Court finds that the undisputed facts show that ARC complied with or surpassed the applicable professional standard of care; therefore, ARC's motion for summary judgment is granted as to the issue of donor screening.

C. SURROGATE TESTING
The Paslode Defendants also argue that ARC was negligent in not using the hepatitis core B antibody test as a surrogate test for HIV. According to the Paslode Defendants, in 1983 and 1984, there was evidence of a correlation between those individuals testing positive for the hepatitis core B antibody and those with AIDS; therefore, the test would assist in identifying individuals who were members of high risk groups. ARC counters *972 that its actions comported with the standard of care utilized by the blood collection industry during the relevant time period.
The undisputed evidence in this case shows that no volunteer blood collector used the hepatitis B core antibody test as a surrogate marker for AIDS in 1983. (Decl. of Dr. Kathleen Sazama at par. 10). Further, except for approximately four collectors in the San Francisco area, no volunteer blood collector used the surrogate test as of September 1984. Id. No federal agency or professional blood collection standard-setting entity, including the FDA and the AABB, ever required or recommended the use of a surrogate test for AIDS. Id. at par. 9. ARC's testing policies and procedures in 1983 and 1984 satisfied the AABB standards, the FDA regulations and the United States Public Health Service recommendations. Id. at par. 6.
The Paslode Defendants' experts, Dr. Silverman and Dr. O'Connor, do not challenge this evidence. Rather, they opine, based on their current knowledge of HIV and AIDS,[3] that the hepatitis B core antibody test should have been performed by ARC in 1983 and 1984 as a surrogate test for HIV. However, the reasonableness of ARC's actions must be determined in light of facts existing and known at the time in question, in this case 1983 and 1984, rather than on the basis of facts revealed by subsequent developments. Miller v. Scholl, 594 S.W.2d 324, 329 (Mo.Ct.App.1980). Moreover, the standard of care that the Paslode Defendants' experts would have preferred is insufficient to support a submission of negligence in a medical malpractice case since the standard of care these individuals preferred may have been higher or lower than the standard of the profession generally. Id.
The undisputed evidence shows that the blood banking profession almost uniformly did not use surrogate testing as a marker for HIV or AIDS. Therefore, ARC in not implementing the hepatitis B core antigen test did not deviate from the standard of care established by the blood banking profession. ARC's motion for summary judgment is granted as to the issue of surrogate testing.

D. STRICT LIABILITY AND IMPLIED WARRANTIES
The Paslode Defendants also assert claims against ARC for strict products liability and breach of implied warranties, claiming that the blood products received by Plaintiff Kevin Smith were defective and unreasonably dangerous. ARC argues that under Missouri law these causes of action are not available against it as a collector, processor, and distributor of blood.
To recover under the theory of strict products liability, a plaintiff must show, among other things, that the defendant sold a product in the course of its business. Fahy v. Dresser Indus., Inc., 740 S.W.2d 635, 637 (Mo. banc 1987), cert. denied, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). Missouri law provides in pertinent part:
The procurement, processing, distribution or use of whole blood, plasma, blood products, blood derivatives and other human tissues ... for the purpose of injecting, transfusing or transplanting any of them into the human body is declared to be, for all purposes, the rendition of a service by every person, firm, or corporation participating therein and, whether or not any remuneration is paid therefor, is declared not to be a sale of such whole blood, plasma, blood products, blood derivatives or other tissues ... for any purpose subsequent to enactment of this section. It is further declared that any implied warranties of merchantability and fitness for a particular purpose shall not be applicable as to a defect that *973 cannot be detected or removed by reasonable use of scientific procedures or techniques. Nothing herein shall relieve any person, firm or corporation from negligence.
Mo.Ann.Stat. § 431.069 (Vernon Supp. 1991).
Under this section, the collection, processing and distribution of blood by ARC is a service, not a sale of goods. Therefore, ARC in performing these functions did not engage in the sale of a product. Consequently, an action for strict products liability is not available against ARC under the facts of this case. Accord Hyland Therapeutics v. Superior Court of California, 175 Cal.App.3d 509, 220 Cal.Rptr. 590, 592-93 (1985), rev. denied, (March 12, 1986); McDonald v. Sacramento Medical Found. Blood Bank, 62 Cal.App.3d 866, 133 Cal. Rptr. 444, 447 (1976); Zichichi v. Middlesex Memorial Hosp., 204 Conn. 399, 528 A.2d 805, 808 (1987); McAllister v. American Nat'l Red Cross, 240 Ga. 246, 240 S.E.2d 247, 249 (1977); Juneau v. Interstate Blood Bank, 333 So.2d 354, 358 (La. Ct.App.1976); Shelby v. St. Luke's Episcopal Hosp., Nos. H-86-3780, H-87-901, 1988 WL 28996 at *2 (S.D.Tex. March 17, 1988). Further, in the absence of blood shield statutes, courts have held that recipients of blood products cannot maintain an action for strict liability against distributors of blood products since blood is an unavoidably unsafe product. See Moore v. Underwood Memorial Hosp., 147 N.J.Super. 252, 371 A.2d 105, 107 (1977); Hines v. St. Joseph's Hosp., 86 N.M. 763, 527 P.2d 1075, 1076-77 (Ct.App.1974), cert. denied, 87 N.M. 111, 529 P.2d 1232 (1974).
As to the Paslode Defendants' claim that ARC breached implied warranties, Section 431.069 states that implied warranties of merchantability and fitness for a particular purpose are not applicable in cases involving the procurement, processing or distribution of blood if the defect alleged could not be detected or removed by reasonable use of scientific procedures or techniques. It is undisputed that HIV was not isolated until the spring of 1984. (Decl. of Dennis M. Donohue, M.D. at par. 14). It is further undisputed that no test existed in 1983 and 1984 which could detect or remove HIV. (Decl. of Dr. Ronald Strauss at par. 16). The test to detect AIDS was developed in March 1985. Id. There is still no procedure to remove AIDS from blood or blood components. Id.
Although the Paslode Defendants argue that a jury question remains as to whether more aggressive donor screening or surrogate testing could reasonably detect HIV, the undisputed facts show that the aim of those techniques was only to help identify members of high risk groups. There is no evidence that those techniques would aid in the detection of HIV.
Finally, the Paslode Defendants argue that the Blood Shield Statute violates the provisions of the Missouri Constitution and of the United States Constitution, guaranteeing due process and equal protection. They claim the statute imposes a discriminatory restriction upon legal remedies without a justifying rational basis. However, the Court finds that blood shield statutes represent the public policy that seeks to ensure an adequate blood supply to meet the overwhelming need for blood and blood products for transfusions. Accord Hyland Therapeutics v. Superior Court of California, 175 Cal.App.3d 509, 220 Cal.Rptr. 590, 592-93 (1985); McDonald v. Sacramento Medical Found. Blood Bank, 62 Cal.App.3d 866, 133 Cal. Rptr. 444, 448 (1976); McAllister v. American Nat'l Red Cross, 240 Ga. 246, 240 S.E.2d 247, 249-50 (1977). Therefore, the Missouri Blood Shield Statute does not violate the Missouri Constitution or the United States Constitution since a justifiable, rational basis exists for restricting legal remedies.
Accordingly, ARC's motion for summary judgment is granted as to the issues of strict liability and breach of implied warranties.

E. NON-A NON-B HEPATITIS
Finally, the Court notes that the parties present brief arguments as to whether ARC was negligent in not administering the hepatitis B core antibody test to detect *974 non-A non-B hepatitis in the blood products supplied to Plaintiff Kevin Smith. According to the Paslode Defendants, Plaintiff Kevin Smith contracted non-A non-B hepatitis as a result of his 1983 transfusion. The Court notes, however, that this allegation has not been made either in Plaintiffs' First Amended Complaint or in the Paslode Defendants' Second Amended Third Party Complaint and Cross-Claim. Therefore, whether Plaintiff Kevin Smith contracted non-A non-B hepatitis as a result of ARC's negligence is not an issue currently before the Court.
Accordingly,
IT IS HEREBY ORDERED that Plaintiffs' Rule 59(e) Motion to Alter or Amend Court Order of March 16, 1992 is GRANTED.
IT IS FURTHER ORDERED that this Memorandum and Order is incorporated into the Memorandum and Order of March 16, 1992.
IT IS FURTHER ORDERED that Third Party Defendant American Red Cross's Request for Clarification as to this Court's Grant of Summary Judgment for the Red Cross is GRANTED.
IT IS FURTHER ORDERED that Defendant American Red Cross's Motion for Summary Judgment as to the Third Party Complaint is GRANTED. Third Party Plaintiffs' claims against Defendant American Red Cross are DISMISSED.
NOTES
[1] ARC moved for a protective order striking this evidence as inadmissible. (See Motion for a Protective Order Striking Inadmissible Evidence, filed April 1, 1991). That motion was denied as moot in the Court's March 16, 1992 Memorandum and Order. The Court does not alter that ruling since this evidence is insufficient to raise a material question of fact.
[2] ARC provided evidence that Alpha Therapeutic's direct questioning screening procedure lasted only a short time. (Suppl.Decl. of Dennis Donohue, M.D. at par. 4).
[3] Dr. O'Connor formed his opinion concerning the need for surrogate testing years after the period in question. (Dep. of Dr. O'Connor at pp. 112-13). Dr. Silverman repeatedly qualified his opinions with the assertion that they were formed as a result of his retrospective examination of the issue in light of the information currently available. (Dep. of Dr. Silverman at pp. 44-45, 55, 100). Moreover, Dr. Silverman does not remember recommending or suggesting the use of surrogate testing to blood banking authorities in 1983 or 1984. Id. at pp. 46-47.