Amato P. ZACCONE Sr., Executor of
the Estate of Violet M. Zaccone,
deceased, Plaintiff,

v.

The AMERICAN RED CROSS,
et al., Defendants.

No. 1:92CV1341.

United States District Court,
N.D. Ohio,
Eastern Division.

Apr. 20, 1994.

James W. Burke, Fairview Park, OH, for plaintiff Amato P. Zaccone, Sr., Executor of Estate of Violet M. Zaccone, Deceased.

James S. Oliphant, Joyce D. Edelman, Porter, Wright, Morris & Arthur, Columbus, OH, Bruce M. Chadwick, L. Hope O'Keeffe, Arnold & Porter, Washington, DC, Edward L. Wolf, American Red Cross, Washington, DC, Patricia A. Screen, Hugh E. McKay, Porter, Wright, Morris & Arthur, Cleveland, OH, for defendant American Red Cross Northern Ohio Regional Blood Services.

David Cooper Comstock, Jr., Comstock, Springer & Wilson, Youngstown, OH, for defendant St. Elizabeth Hosp. Medical Center.

Robert Douglas Warner, Reminger & Reminger, John R. Irwin, Law Offices of John R. Irwin, Cleveland, OH, for defendants Edmund A. Massullo, M.D., John A. Agnone, M.D., Angelo Riberi, M.D.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On November 8, 1988, Amato P. Zaccone, Executor of the Estate of Violet M. Zaccone, Deceased, filed the above captioned case against the American Red Cross (Red Cross), Saint Elizabeth Hospital Medical Center, and three doctors.[1] Plaintiff alleges that the Red Cross was negligent in processing and supplying blood infected with Human Immunodeficiency Virus (HIV), which infected his wife Violet M. Zaccone, and resulted in her contracting Acquired Immunodeficiency Syndrome (AIDS) and her eventual death. He sues for personal injury under the Ohio Survival Statute,[2] and for wrongful death, loss of consortium (for himself and Mrs. Zac-

cone's surviving children), hospital bills and punitive damages.

On July 1, 1992, the case was removed to this court. Jurisdiction is proper pursuant to 36 U.S.C. § 2. See American National Red Cross v. S.G., — U.S. —, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992).

On June 21, 1993, the Red Cross filed a motion of summary judgment on the issue of negligence. On June 30, 1993, it filed a motion for partial summary judgment on the survival claim based on the statute of limitations.[3] For the following reasons, summary judgment is granted for the Red Cross on the issue of negligence and, therefore, the motion for partial summary judgment is moot.

### I.

On April 12, 1984, a 19-year-old male student at Kent State University donated blood at a Northern Ohio Red Cross mobile unit. On April 25, 1984, Mrs. Zaccone received a transfusion, during cardiac surgery at Youngstown Saint Elizabeth Hospital, of a unit of blood from this donor. The Red Cross does not contest that this unit was infected with HIV and that it infected Mrs. Zaccone and caused her death as a result of AIDS.

The donation procedures followed by the Northern Ohio Red Cross in April, 1984, are described in the declaration of Dr. Louise Keating, the Director of Blood Services for the Northern Ohio Red Cross. There is no evidence that these procedures were not followed for the donation at issue here.

Dr. Keating declares that all blood donors were orally instructed to review a pamphlet titled, "What you Should Know about Giving Blood." The pamphlet stated:

At the time, there is no laboratory test to detect blood that is capable of transmitting AIDS. We must therefore rely on blood donors' health histories to exclude individ-

---

1. Plaintiff has voluntarily dismissed the Hospital and doctors.

2. Ohio Rev.Code § 2305.21.

3. The June 30, 1993, motion for summary judgment included the wrongful death claims asserted by Mrs. Zaccone's children, however, defendant withdrew its motion on this issue.

uals whose blood might transmit AIDS to patients who will receive that blood.

The pamphlet then described individuals at risk, including "persons with symptoms and signs suggestive of AIDS," "sexually active homosexual or bisexual men with multiple partners," and "sexual partners of persons at increased risk of AIDS." It also described the signs and symptoms of AIDS and instructed donors who believe they may be at high risk not to donate or if they do donate to call the Red Cross soon thereafter. It also instructed any donor with questions to speak to the health history interviewer or one of the attending nurses. Finally, the donor was asked to sign a statement that he read and understood this information.

Next, a registered nurse conducted a FDA approved health history questionnaire of each donor. The questionnaire included a number of questions designed to identify signs and symptoms of AIDS, however, it did not include any questions concerning sexual history. It did, however, include a question that the donor had read and understood the pamphlet about giving blood. Kathryn Maston, R.N., conducted the history of the donor in this case and attests that he gave no answers that would place him in a high risk category.

After Nurse Maston questioned the donor, a second nurse, Dennis Skokut, R.N., reviewed his questionnaire responses and conducted a brief physical examination that included checking his temperature, pulse, blood pressure and hemoglobin count. Nurse Skokut also examined his arms for any signs of intravenous drug use or infectious skin diseases. The results of these tests were acceptable and Nurse Skokut drew the blood.

The blood was subjected to all serologic testing required by pertinent FDA regulations and American Association of Blood Banks (AABB) standards. These tests did not include a test for HIV antibodies because it was not until March, 1985, that such a test was developed and approved by the FDA. The Red Cross admits that it did not run a "surrogate test" for HIV antibodies such as the hepatitis B core antibodies test.

On April 18, 1985, the donor again gave blood and it tested positive for HIV. In August, 1985, the Red Cross informed the donor and interviewed him. He revealed that he had a relationship with a single male partner in 1983 and 1984, however, he never had any signs or symptoms of AIDS.

The Red Cross participated in a FDA approved "lookback program" and identified the donor's previous donation. On July 15, 1986, it notified Saint Elizabeths Hospital by letter that the donor of the blood supplied in April, 1984, had tested positive for HIV. The letter asked the Hospital to contact the physician who used the blood and suggested that the recipient take a blood test.

On August 29, 1986, Mrs. Zaccone's physician informed her that she was HIV positive. On November 4, 1987, she died as a result of AIDS.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56. The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The substantive law identifies which specific facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510.

### III.

Plaintiff contends that the Red Cross was negligent because; (1) it did not perform the hepatitis B core antibodies test as a surrogate test for detecting HIV, (2) it did not screen donors with confrontational questions about their sexual history, (3) it did not recommend autologous transfusions and directed donations, (4) it did not properly train its staff about the signs and symptoms of AIDS, and (5) it did not promptly notify Mrs. Zaccone that the donor of the blood used in her transfusion tested positive for HIV.

### A.

■ The Red Cross contends that, under Ohio law, blood banks are subject to a professional standard of care, and therefore, it cannot be negligent if it met the generally recognized and accepted practices of blood bank professionals in April, 1984. Plaintiff contends that an ordinary standard of care applies, requiring the Red Cross to use the degree of care an ordinarily careful and prudent person would use under the same circumstances.

Although no Ohio court has directly addressed the standard of care for blood banks, many jurisdictions have adopted the view that blood banks are health care professionals and therefore subject to a professional standard of care.[4]

In Ohio, the procuring, processing, distributing, or using of human blood or blood products for the purpose of transfusions is a service. Ohio Rev.Code § 2108.11. The Red Cross utilizes extensive medical expertise in providing its services. The collection and processing of blood is carried out by trained health care professionals. Blood donors are screened through medical histories and given limited physical examinations by licensed nurses, who are supervised by doctors. The blood is then subjected to various laboratory tests and separated into components by trained medical professionals. Therefore, the Red Cross is a health care professional and subject to a professional standard of care.

The blood banking profession is heavily regulated and therefore, the "generally recognized and accepted practices" of the profession are discernible. The FDA promulgates comprehensive regulations and recommendations for blood banks. *See* 21 C.F.R. § 600 *et seq.* The FDA also permits any licensed facility to adopt the procedures of the AABB or the Red Cross "as long as such specific procedures are consistent with, and at least as stringent as," the requirements in the CFR. 21 C.F.R. § 606.100(d).

### B.

■ The Red Cross did not perform a hepatitis B antibodies test on donated blood in April, 1984. However, plaintiff's experts concede that no government agency or standard setting organization (including the FDA, AABB or Red Cross) recommended or

4. *See e.g., McKee v. Miles Lab., Inc.*, 675 F.Supp. 1060 (E.D.Ky.1987), *affirmed McKee v. Cutter Lab., Inc.*, 866 F.2d 219 (6th Cir.1989); *Doe v. American Red Cross Blood Services*, 297 S.C. 430, 377 S.E.2d 323 (1989), *answer to certified question*, 125 F.R.D. 637 (D.S.C.1989); *Smith v. Paslode Corp.*, 799 F.Supp. 960 (E.D.Mo.1992), *Smythe v. American Red Cross et al.*, 797 F.Supp. 147 (N.D.N.Y.1992), *Valdiviez v. U.S.*, 884 F.2d 196 (5th Cir.1989); *Osborn v. Irwin Memorial Blood Bank*, 5 Cal.App.4th 234, 7 Cal.Rptr.2d 101 (1992); *United Blood Services v. Quintana*, 827 P.2d 509 (Colo.1992); *Kozup v. Georgetown Univ.*, 663 F.Supp. 1048 (D.D.C.1987), *aff'd in relevant part*, 851 F.2d 437 (D.C.Cir.1988).

required this test in April, 1984.[5] Instead, they argue that blood banks should have used the hepatitis B antibodies test in April, 1984. However, the hindsight opinions of plaintiff's experts cannot create "a prima facie case of negligence, where they are entirely in opposition to the standard prevailing at every hospital and blood bank in the nation." *Kozup v. Georgetown University,* 663 F.Supp. 1048, 1057 (D.D.C.1987), *aff'd in relevant part,* 851 F.2d 437 (D.C.Cir.1988); *see also, Smith v. Paslode Corp.,* 799 F.Supp. 960 (E.D.Mo.1992).

The Red Cross also did not conduct confrontational questioning of donor's sexual history during donor screening. However, plaintiff's experts again concede that no government agency or standard setting organization recommended confrontational questioning in April, 1984. The screening procedure employed by the Red Cross, including the pamphlet and health history questionnaire, met the standard of care established by the blood banking profession.

Plaintiff also charges that the Red Cross was negligent in not recommending autologous transfusions and directed donations.[6] However, in 1983, the Red Cross published a statement recommending autologous transfusions and directed donations. Furthermore, the learned intermediary doctrine prevents liability for the Red Cross if Mrs. Zaccone's doctors did not recommend these procedures. *See e.g. Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 21 O.O.3d 121, 423 N.E.2d 831, 834 (1981).

Plaintiff further charges that the Red Cross was negligent in training its nursing personnel. He bases this charge on Nurse Maston's deposition and her inability to identify some of the signs and symptoms of AIDS. However, in 1983 and 1984, the Red Cross required its staff to go through extensive training concerning the signs and symp-

toms of AIDS. Furthermore, even if Nurse Maston was inadequately trained, the donor in this case did not have any signs or symptoms of AIDS in August, 1985, when his blood tested positive for HIV.

Finally, plaintiff charges that the Red Cross should have notified Mrs. Zaccone immediately after the donor tested HIV positive in August, 1985, instead of waiting until it developed its "lookback" program in July, 1986. However, regardless of whether the Red Cross was negligent in taking almost a year to develop its "lookback" program, the plaintiff suffered no damages from the delay. He does not allege that Mrs. Zaccone spread the disease to anyone else. Furthermore, in 1985, there were no early treatment procedures for those inflicted and AIDS remains an incurable disease.[7]

### IV.

Plaintiff argues that even if the Red Cross is subject to a professional standard of care, the profession's standard is not conclusive proof of due care. In *United Blood Services v. Quintana,* 827 P.2d 509 (Colo. 1992), the Court overturned a trial court's grant of summary judgment in favor of a defendant blood bank. It held that blood banks are subject to a professional standard of care, but that the standard of care adopted by a profession constitutes only a rebuttable presumption of due care. *Id.* at 521. The Court relied on Judge Hand's famous opinion in *The T.J. Hooper,* 60 F.2d 737 (2nd Cir. 1932), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), for the proposition that a member of a profession can be negligent if the entire profession "lagged behind in adopting reasonably prudent measures." *Quintana,* 827 P.2d at 520. The Court concluded that summary judgment is not appropriate, even if the defendant complied with the profession's standard of care:

---

**5.** The first volunteer blood bank to begin use of this test was in the high-risk San Francisco area and it began testing on April 12, 1984, the same day the blood in this case was donated. The Red Cross points out that the blood banks run by plaintiff's blood banking experts did not perform this test in April, 1984.

**6.** Autologous transfusions involve storing one's own blood for later use. Directed donations are donations from family and friends.

**7.** The drug used to alleviate the symptoms of AIDS, AZT, was not developed and licensed until March, 1987.

In a professional negligence case, therefore, a plaintiff should be permitted to present expert opinion testimony that the standard of care adopted by the school of practice to which the defendant adheres is unreasonably deficient by not incorporating readily available practices and procedures substantially more protective against the harm caused to the plaintiff than the standard of care adopted by the defendant's school of practice.

*Id.* at 521.

However, numerous courts have held that the blood banking profession did not "lag behind" in adopting procedures that reasonable prudence would dictate it follow:

> The blood bank profession responded promptly to the reports which hypothesized that AIDS was transmissible via blood by holding a series of meetings to evaluate the etiology of AIDS, and recommending a prudent strategy to reduce the risk of transmitting AIDS via blood and blood products.

*Seitzinger v. American Red Cross*, 1992 WL 361700, at p. 8 (E.D.Pa.1992). *see also Smythe v. American Red Cross*, 797 F.Supp. 147, 152 (E.D.N.Y.1992); *Hernandez v. Nueces County Medical Society*, 779 S.W.2d 867 (Ct.App.Tex.1989); *McKee v. Miles Lab., Inc.*, 675 F.Supp. 1060 (E.D.Ky.1987), *affirmed McKee v. Cutter Lab., Inc.*, 866 F.2d 219 (6th Cir.1989); *Kozup v. Georgetown Univ.*, 663 F.Supp. 1048 (D.D.C.1987), *aff'd in relevant part*, 851 F.2d 437 (D.C.Cir. 1988).[8] The court agrees that there is no genuine issue of fact as to whether the entire profession "lagged behind" in adopting reasonably prudent measures to protect the blood supply.

Furthermore, under Ohio law, the duty of care in a professional negligence action is dictated solely by the profession's standard:

> Unless he represents that he has a greater or lesser skill or knowledge a [professional] owes a duty of care to use the skill, knowledge, care and diligence normally possessed by members of his profession or trade in similar communities: that is, to do those things that such a [professional] would do and to refrain from doing those things which such a [professional] would not do.

3 *Ohio Civil Jury Instructions*, § 331.10 (1992). *See Bruni v. Tatsumi*, 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673 (1976). Plaintiff's experts concede that the Red Cross took the same precautions as virtually the entire profession and therefore exhibited "the care and diligence normally possessed" by the blood bank profession. The hindsight opinions of plaintiff's experts cannot "supplant the standard of care as established by the conduct of the medical community." *Kozup*, 663 F.Supp. 1048; *see also McKee*, 675 F.Supp. 1060; *Seitzinger*, 1992 WL 361700.

Accordingly, there is no genuine question of material fact that the Red Cross conformed to the standards of care of the blood banking profession in April, 1984, and summary judgment is granted.

IT IS SO ORDERED.

---

8. *See Kozup*, 663 F.Supp. at 1051–1057, for a chronology of AIDS research and the blood bank profession's involvement in and responses to the state of AIDS research.